**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **ERICSSON INC., AND TELEFONAKTIEBOLAGET LM ERICSSON,** | |
| **Plaintiff,** | **Civil Action No. 2:15-cv-00011-RSP** |
| **v.** | |
| **TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., TCT MOBILE LIMITED, AND TCT MOBILE (US), INC.,** | **JURY TRIAL** |
| **Defendant.** | |

**ERICSSON'S RESPONSE IN OPPOSITION TO TCL'S MOTION FOR SUMMARY
JUDGMENT THAT THE ASSERTED CLAIMS OF THE '510 PATENT ARE INVALID**

**TABLE OF CONTENTS**

I. INTRODUCTION ..................................................................................................................1

II. ARGUMENT .......................................................................................................................3

    a. Step 1: The '510 Patent is not Directed to a Patent-Ineligible Abstract Idea ..........4

        1. The asserted claims are patent eligible because they provide a particular technological solution to a problem rooted in computer technology...................... 4

        2. The cases cited by TCL are readily distinguishable ..................................... 10

    b. Step 2: The Asserted Claims Include an Inventive Concept.................................13

III. CONCLUSION..................................................................................................................17

McKool 1156639v10

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alice Corp. v. CLS Bank It'l*,
134 S. Ct. 2347 (2014).................................................................................3, 4, 9

*BASCOM Global Internet Servs. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016).......................................................................14, 17

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014).......................................................................4, 13

*Diamond v. Diehr*,
450 U.S 175 (1981)................................................................................................5

*Enfish, LLC v. Microsoft, Corp.*,
833 F.3d 1327 (Fed. Cir. 2016)................................................................1, 4, 5, 10

*Execware, LLC v. BJ's Wholesale Club, Inc.*,
2015 U.S. Dist. LEXIS 132387 (D. Del. Sept. 30, 2015).....................................12

*Gonzalez v. Infostream Group, Inc.*,
2:14-cv-906-JRG-RSP, Dkt. No. 160 at 8 (E.D. Tex. Feb. 6, 2016) ..................4, 12

*Mkt. Track, LLC v. Efficient Collaborative Retail Mktg.*,
2015 WL 3637740 (N.D. Ill. June 11, 2015) .......................................................14

*Motio, Inc. v. BSP Software LLC*,
2016 U.S. Dist. LEXIS 83 (E.D. Tex. Jan 4, 2016)..............................................12

*Perdiemco, LLC v. Industrack, LLC*,
Case No. 2:15-CV-727-JRG-RSP, 2016 U.S. Dist. LEXIS 135667 (E.D. Tex.
Sept. 21, 2016) .............................................................................................. passim

*Personalized Media Communs., LLC v. Funai Elec. Co.*,
2017 U.S. Dist. LEXIS 34569 (E.D. Tex. Feb. 21, 2017) ....................................12

*Personalized Media Communs., LLC v. Samsung Elecs. Am., Inc.*,
Case No. 2:15-CV-1754-JRG-RSP, 2016 U.S. Dist. LEXIS 135669 (E.D. Tex.
Sept. 21, 2016) .....................................................................................................14

*Smartflash LLC v. Apple, Inc.*,
--- Fed. Appx. ---, 2017 U.S. Dist. LEXIS 3833 (Fed. Cir. Mar. 1, 2017) .............10

*Torpharm Inc. v. Ranbaxy Pharmaceuticals, Inc.*,
336 F.3d 1322 (Fed. Cir. 2003)............................................................................15

*Ultramercial, Inc. v. Hulu,*
   722 F.3d 1334 (Fed. Cir. 2013)..............................................................................................14

*Woodrow Woods and Marine Exhaust Systems, Inc. v. Deangelo Marine Exhaust, Inc.,*
   692 F.3d 1272 (Fed. Cir. 2012)..............................................................................................15

STATUTES

35 U.S.C. § 101................................................................................................................ passim

## I.     INTRODUCTION

TCL's Motion for Summary Judgment is based on a misapprehension of what constitutes patentable subject matter under 35 U.S.C. § 101. In *Enfish, LLC v. Microsoft, Corp.*, 833 F.3d 1327 (Fed. Cir. 2016)—a case TCL does not address, much less distinguish—the Federal Circuit held that claims are patent-eligible under § 101 when "the plain focus of the claims is on an improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity." That is precisely the case here.

Ericsson's '510 patent solves a critical problem related to cellular telephones and downloadable applications—how to allow a user to grant specific applications (such as Skype) permission to use specific functionalities offered by the phone (such as the camera and the microphone) while denying access to other functionalities (such as location services). This permits a user to limit the functionalities that can be accessed by third-party applications based on the user's intended use of the application and the degree to which security and privacy are desired. These functionalities offered by a phone to third party applications are referred to as "services" in the '510 patent.

The provisional application for the '510 patent was filed in 2002, six years before the Apple App Store and the Google Android Market opened. In this pre-downloadable app world of the early 2000s, mobile devices were sold with software preloaded by the manufacturer. As such, there was no need to segregate pre-loaded applications from sensitive services offered by the phone, because the pre-loaded applications posed no risk to the user. The inventors recognized that third-party applications would become commonplace, and predicted that allowing third-party applications to access all services features of a phone (microphone, camera, location, etc.) would create an unacceptable security risk. The inventors also recognized that comingling downloaded applications and services within the same layer of the computer architecture would

make it extremely difficult to secure every possible point of entry into these sensitive services from the downloaded applications. To solve this problem, the inventors designed a layered computer architecture that segregates applications from sensitive services with an "interface component," a middleware layer that creates a barrier between applications and offered services. The middleware layer improves the security and privacy of a phone by defining the location where applications can access services offered by the phone and by using an access controller to decide whether applications have been granted access to requested services. The system need only secure the interfaces provided by the interface component to ensure the services are safe.

Defining the point of access as the interface component enables the system to use an access controller to toggle permissions on and off on an application-by-application and service-by-service basis. This allows the user to specify, based on the user's own projected use of the phones and security/privacy concerns, which services to permit the application to access. For instance, the user may permit a third-party speech recognition application to access the microphone, but not the camera. Another user may decide he wants to tag photos with location information, so would permit a third-party photo application to access camera and location services, but not microphone. Thus, the claims do not merely recite the performance of some business practice known from the pre-computer world along with the requirement to perform it on a computer, but rather provides a solution to a problem necessarily rooted in computer technology and provided one of the fundamental building blocks of downloadable application ecosystems for Android (as well as other operating systems).

Even if Ericsson's '510 patent were directed to an abstract idea—which it is not—the asserted claims are still patent eligible.  Ericsson's invention is directed to a specific architecture for use in mobile terminals that provides a significant improvement over prior art security

architectures. Indeed, TCL's expert was unable to find a single prior art reference (or even a combination of references) disclosing all elements of the claimed layered architecture. Because Ericsson's asserted claims teach an unconventional computer architecture for enhancing security on a mobile terminal, the asserted claims are nevertheless patent eligible if the Court determines that they are directed to an abstract idea.

## II.    ARGUMENT

Patent protection is available for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof …." 35 U.S.C. § 101. However, laws of nature, natural phenomena, and abstract ideas are not patentable. *Alice Corp. v. CLS Bank It'l*, 134 S. Ct. 2347, 2354 (2014). The rationale behind this exclusion is "one of preemption" — a "concern that patent law not inhibit further discovery by improperly tying up the future use of [] building block of human ingenuity." *Id*. The Supreme Court has created a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 132 S. Ct. at 2355. First, a court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id*. Second, a court must "determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id*. at 2355.

The asserted claims are valid under either step of the § 101 analysis. First, the '510 patent addresses eligible subject matter because it teaches a specific solution to a problem unique to a particular computer system that utilizes a service-based platform, i.e., how to secure sensitive services offered by a device from third-party applications being installed, loaded, and run on that device. Second, even if claiming an abstract idea, Ericsson's '510 patent teaches an unconventional architecture that confines the claims to a particular useful application of the alleged abstract idea.

### a.      Step 1: The '510 Patent is not Directed to a Patent-Ineligible Abstract Idea

The question in Step 1 is whether the asserted claims are directed to a law of nature, natural phenomena, or an abstract idea. *Alice*, 134 S. Ct. at 2355. As the Federal Circuit explained in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014), a computer-related claim does not claim an abstract idea if "the claimed solution is *necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks*."[1] *See also Enfish*, 833 F.3d at 1339 (holding claims patent eligible because they "are directed to a specific implementation of a solution to a problem in the software arts" and not "general-purpose computer components [] added post-hoc to a fundamental economic practice or mathematical equation"); *Gonzalez v. Infostream Group, Inc.*, 2:14-cv-906-JRG-RSP, Dkt. No. 160 at 8 (E.D. Tex. Feb. 6, 2016) (rejecting § 101 challenge when invention directed to "a concrete and specific way of conducting data storage and search."). The "analysis turns on whether the claims in these patents focus on specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *Perdiemco, LLC v. Industrack, LLC*, Case No. 2:15-CV-727-JRG-RSP, 2016 U.S. Dist. LEXIS 135667 at *17 (E.D. Tex. Sept. 21, 2016). This analysis "requires the movant to substantively engage with the role played by the computer limitations in the context of the claim, not ignore those limitations." *Id.*

> #### 1. *The asserted claims are patent eligible because they provide a particular technological solution to a problem rooted in computer technology*

The asserted claims solve a problem arising in the realm of computer technology, and specifically, in the context of a platform that allows for installing, loading, and running of downloaded applications that access sensitive services offered by a device. TCL fails to

---

[1] Note that there is some debate as to whether the *DDR* reasoning applies to the first or second step of the §101 analysis.  Ericsson's analysis of *DDR* is the same whether applied to step one or step two.

meaningfully engage with the limitations in the '510 patent and instead creates a straw-man by generalizing all twelve limitations of the asserted claims as a "gatekeeper." Dkt. No. 299 at 1. But as the Federal Circuit cautioned in *Enfish*, "describing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to §101 swallow the rule." 833 F.3d at 1337; *see also Diamond v. Diehr*, 450 U.S 175, 189 n.12 (1981) (cautioning that overgeneralizing claims, "if carried to its extreme, make[s] all inventions unpatentable because all inventions can be reduced to underlying principles of nature which, once known, make their implementation obvious."). If the claims were as simple and broad as a general purpose computer using a gatekeeper, as TCL contends, then surely TCL would have located *one prior art reference* invalidating the claims. TCL failed to do so because the claims teach a particular computer architecture that did not exist in the prior art.

***The Problem***. When this patent application was filed in 2002, cell phone makers traditionally "designed, fabricated, and marketed substantially complete mobile terminal systems that include[d] all the hardware and software needed" by the user. '510 patent at 1:62-2:1. But this "approach [did] not provide the flexibility to adapt to rapid changes in market or to satisfy the diverse requirements of multiple users." *Id*. at 2:1-3. The inventors recognized that users would want to customize their devices with downloaded applications, but downloading applications created security risks because the applications "depend on functionality that is provided by the native code" of the device, *Id*. at 2:25-28. "Unrestricted access to such native functionality in, for example, the platform domain or the application domain, may jeopardize the integrity of the mobile terminal, by, e.g., initiating cost incurring events without notifying the end user." *Id*. at 2:28-32. The inventors thus saw the need to separate the platform domain

(having the offered services) from the application domain so as to restrict access to well-defined entry points.

*Ericsson's Solution*.  Ericsson's '510 patent solves this problem by employing a layered computer architecture that segregates applications from sensitive services on a user's device and funnels requests to access services, whether during installation, loading, or runtime, through an interface component. For example, Figure 1 appears as follows (colors added):



FIG. 1

In the proposed architecture, the "mobile terminal," e.g., a cellular phone, is depicted by the dashed box 16. The mobile terminal comes pre-loaded with a "mobile terminal platform assembly," depicted in the yellow box within the mobile terminal. The Applications 14 are depicted in the green box as sitting *outside the mobile terminal platform assembly*. At the top of the mobile terminal platform assembly is the interface component, depicted as the blue box labeled "Middleware Services." Below this interface component is the software services component 22, depicted in the red box, that offers services to applications, e.g., access to a user's

location or phone book. Critically*, the interface component (blue box) sits between the software services component (red box) and the applications (green box)*, so if an application wants access to the software services component, it must go through the interface component, whether during installation, loading, or runtime. This layered architecture is one of the novel aspects of the '510 patent.

Claim 1 reads as follows:

A system for controlling access to a platform, the system comprising:

a platform having *a software services component* and an *interface component*, the interface component having at least one interface for providing access to the software services component for enabling *application domain software* to be installed, loaded, and run in the platform;

an access controller for controlling access to the software services component by a requesting application domain software via the at least one interface, the access controller comprising:

an interception module for receiving a request from the requesting application domain software to access the software services component;

and a decision entity for determining if the request should be granted wherein the decision entity is a security access manager, the security access manager holding access and permission policies; and

wherein the requesting application domain software is granted access to the software services component via the at least one interface if the request is granted.

Thus, claim 1 teaches a platform having a software services component, an interface component, and application domain software. If software in the application domain seeks to access the software services component, whether during installation, loading, or runtime, it must do so through an interface provided by the interface component. An access controller receives the application's request with an interception module, and consults held access and permissions policies to determine whether the request should be granted. Thus, contrary to TCL's argument,

McKool 1156639v10

the '510 patent does not claim a general purpose computer using a gatekeeper, but rather a particular computer architecture that segregates applications and services into separate layers.

The claimed architecture provides numerous technological benefits over and above merely "using a gatekeeper." Segregating the application domain from the software services component and funneling requests to access the software services component through the interface component enhances security by limiting the number of entry points to the software services component. Phone manufacturers need only secure the interfaces provided by the interface component to protect users from malicious applications that seek to access a user's microphone, track a user's location, or monitor a user's camera. Limiting the entry points to offered services also increases flexibility for users. The easier it is for the system to locate and secure all entry points to offered services, the easier it is to toggle permissions on and off on a service-by-service and application-by-application basis. Thus, the claimed architecture enables phone manufacturers to notify users which downloaded applications are attempting to access which services, and to allow the users to grant or deny access as desired. Finally, segregating services from applications also makes it easier to update services, for example, to improve the ability to locate a user, with minimal impact on the applications which can continue to access the service through the pre-defined interface provided by the interface component.

The asserted dependent claims also do not claim an abstract idea. Dependent claim 4 adds the inventive concept of a "decision cache" structured within the security access manager that maintains records of requests by applications that have previously been granted. This cache enables the access and permissions policies to be accessed more quickly, thus improving the user experience. Dependents claim 3 and 5 describe particular data structure used by the access

8

controller for determining whether requests should be granted.  Claim 9 further limits the claimed system to mobile phones.

Noticeably absent from TCL's motion is any argument that Ericsson's claims would preempt the abstract idea of a gatekeeper. *See Perdiemco*, 2016 U.S. Dist. LEXIS 135667 at *19 ("A final problem with Defendant's position is a failure to meaningfully address preemption, which is the fundamental concern at stage one of the Mayo analysis."); *Alice Corp. v. CLS Bank It'l*, 134 S. Ct. 2347, 2354 (2014) (explaining that the rationale behind this exclusion is "one of preemption" — a "concern that patent law not inhibit further discovery by improperly tying up the future use of [] building block of human ingenuity"). TCL's failure to argue preemption is unsurprising given its inability to find a single prior art reference or any combination of references disclosing the claimed software architecture. To be sure, Ericsson's patent does not preempt general purpose computers implementing a "gatekeeper." One can envision that prior art systems exist that performed permission checks, but these systems did not use the claimed layered architecture, including a software services component, an interface component, an application domain, and an access controller for controlling access to the software services component. Such systems would not infringe this claim. Systems that do not provide access to the software services component for enabling applications to be ***installed, loaded, and run*** also would not infringe this claim.  Systems that do not use a decision cache to allow for faster access to services would not infringe claim 4. There are countless systems that may utilize the concept of a "gatekeeper" that would not be covered by Ericsson's patent and thus Ericsson's claims present no risk of undue preemption.

Finally, contrary to TCL's argument, Ericsson's claims are not directed to mental processes that can be performed in the human mind. TCL's analysis completely disregards the

claimed layer architecture and focuses exclusively on the security access manager. The '510 patent claims a system having a particular software architecture that enhances security by segregating applications and software services in different layers and thereby minimizing the number of entry points to the software services. The human mind cannot implement this software architecture. The human mind also cannot replicate the limitations of the dependent claims, such as the decision cache which enables the access and permissions policies to be accessed more quickly.

### 2. *The cases cited by TCL are readily distinguishable*

TCL's cited cases do not stand for the proposition that all claims involving control of access to a platform are invalid. Indeed, the question before the court is not simply "whether the claims involve a patent-ineligible concept, because essentially every routinely patent-eligible claim involving physical products and actions involves a law of nature and/or natural phenomenon—after all, they take place in the physical world." *Enfish*, 822 F.3d at 1335. The "analysis turns on whether the claims in these patents focus on specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *Perdiemco,* 2016 U.S. Dist. LEXIS 135667, at *17. Each of the patents in TCL's cited cases are directed to a result or effect that itself is the abstract idea. By contrast, Ericsson's claims are directed to a particular computer architecture that improves the relevant technology, and thus are patent eligible.

For example, in *Smartflash LLC v. Apple, Inc*., --- Fed. Appx. ---, 2017 U.S. Dist. LEXIS 3833 (Fed. Cir. Mar. 1, 2017), the claims at issue were directed to the result of processing a payment, and in exchange, delivering content. The Federal Circuit explained that "[t]he asserted claims here invoke computers merely as tools to execute fundamental economic practices." *Id*. at *11. TCL cannot argue that Ericsson's claims invoke computers merely as a tool to execute a

fundamental economic practice, as the claims do not implement an economic practice at all. Further, the *Smartflash* claims sought to solve a different problem—how to validate payment in exchange for goods. Ericsson's claims, on the other hand, create a computer architecture that segregates potentially dangerous software applications from sensitive services that are installed *on the same system*. Unlike *Smartflash*, Ericsson's claims are not directed to a transaction, but rather to a computer architecture—a particular and narrow technological solution.

TCL also cites *Protegrity USA, Inc. v. Netskope, Inc.*, a Northern District of California case finding that a method claim requiring determining whether a user should be allowed to access results to a database query was directed to "the abstract concept of limiting access to information based on specified criteria." Dkt. No. 216 at 9; No. 15-cv-02515, 2015 WL 6126599, at *6 (N.D. Cal. Oct. 19, 2015). But Ericsson's apparatus claims go far beyond simply claiming the abstract method steps of receiving a query and determining whether the user should be able to see the results. Ericsson's '510 apparatus claims recite a system comprising a layered computer architecture that provides interfaces between applications and services. Further, granting the access requested by an application in Ericsson's patent does not simply return the results of a query, but rather allows access to a protected service and thereby enables an application to be installed, loaded, or run on the platform.

Rather, the asserted claims of the '510 patent are like those in *DDR, Enfish,* and their progeny—and unlike claims involving an age-old idea merely executed by a general purpose computer. For example, in *Cioffi v. Google, Inc.*, this Court applied *Enfish* and *DDR* to reject defendants argument that the claims were directed to "the idea of running a computer process in order to keep it from accessing things it shouldn't," and held instead that the claim at issue was "directed to an allegedly unconventional approach to a malware problem that arose from

11

computer technology, and [the claim] recites a particularized solution to the problem." 2017 U.S. Dist. LEXIS 8119, at *7-8 (E.D. Tex. Jan. 9, 2017) (internal citations omitted). Ericsson's computer architecture is similarly an unconventional and particularized solution to a security problem that arises only in the world of computers. Notably, in *Cioffi*, the defendant had not yet put on its invalidity case, so whether the claim taught an unconventional approach was to be determined. Here, TCL was unable to prove to the PTAB, even under the lower preponderance of the evidence and broadest reasonable interpretation standards, that the claimed layered architecture was disclosed in the prior art. *See also Personalized Media Communs., LLC v. Funai Elec. Co.*, 2017 U.S. Dist. LEXIS 34569 at *3 (E.D. Tex. Feb. 21, 2017) (applying *Enfish* to reject a defendant's § 101 challenge because the asserted claims were directed to "a specific improvement in modern technology and not to an abstract idea."); *Gonzalez v. Infostream Group, Inc.*, 2:14-cv-906-JRG-RSP, Dkt. No. 160 (E.D. Tex. Feb. 6, 2016) (applying *DDR* to reject a defendant's § 101 challenge because the asserted claims were directed to "a specific and concrete implementation of data storage" on an internet website by "organizing data using 'labels.'"); *Motio, Inc. v. BSP Software LLC*, 2016 U.S. Dist. LEXIS 83 (E.D. Tex. Jan 4, 2016) (applying *DDR* to reject a § 101 challenge because the "patent-at-issue expands the functionality of existing computer software, local or on a computer network, by addressing a problem specific to the realm of computers."); *Execware, LLC v. BJ's Wholesale Club, Inc.*, 2015 U.S. Dist. LEXIS 132387, *13 (D. Del. Sept. 30, 2015) (finding the specification "demonstrate[d] that the most important aspect of the invention [was] not the alleged abstract idea of 'displaying, classifying, and organizing unspecified information' generally," but was rather "the creation of an improved user interface for more easily interacting with database and spreadsheet programs on a computer.").

Ericsson claims a computer system that overcomes a technological problem rooted in computer technology. The '510 patent does not generically claim "use of a computer" to perform a "gatekeeper" function, but rather specifies a computer having a particular computer architecture that overrides the routine and conventional sequence of events ordinarily triggered by installing, loading, or running an application. *See DDR*, 773 F.3d at 1258 ("Unlike the claims in *Ultramercial*, the claims at issue here specify how interactions with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink."). This is a far cry from TCL's characterization of the claim, which is simply receiving a request for access and granting or denying that request. The claimed system architecture provides enhanced security and allows for permissions to be granted to applications on a case-by-case or services-by-services basis. That subject matter is patent-eligible under § 101.

### b.      Step 2: The Asserted Claims Include an Inventive Concept

This Court need not reach the second step of the analysis. A court should apply the second step only if it finds in the first step that the claims are directed to a law of nature, natural phenomenon, or abstract idea, which the claims in this case are not as shown above.

Even if the Court were to reach the second step of the analysis, TCL fails to carry its burden there as well. The second step requires the Court to "determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id.* at 2355. A claim may become patent-eligible when the "claimed process include[s] not only a law of nature but also several unconventional steps . . . that confine[] the claims to a particular, useful application of the principle." *Mayo*, 132 S.Ct. at 1300; *see also BASCOM Global Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1348 (Fed. Cir. 2016) ("some inventions' basic thrust

might more easily be understood as directed to an abstract idea, but under step two of the *Alice* analysis, it might become clear that the specific improvements in the recited computer technology go beyond 'well-understood, routine, conventional activit[ies]' and render the invention patent-eligible."). "The [] inquiry is whether a claim, as a whole, includes meaningful limitations restricting it to an application, rather than merely an abstract idea." *Ultramercial, Inc. v. Hulu,* 722 F.3d 1334, 1344 (Fed. Cir. 2013). Critically, "problems that arise *uniquely in computing or in an internet context* weigh in favor of finding an 'inventive concept.'" *Mkt. Track, LLC v. Efficient Collaborative Retail Mktg.*, 2015 WL 3637740, at *4-5 (N.D. Ill. June 11, 2015). A claim is "patent ineligible if it describes only post-solution activity that is purely conventional or obvious." *Perdiemco*, 2016 U.S. Dist. LEXIS 135667 at *10. However, the burden is on the movant to show that "the arrangement of the elements is conventional or generic." *Personalized Media Communs., LLC v. Samsung Elecs. Am., Inc.*, Case No. 2:15-CV-1754-JRG-RSP, 2016 U.S. Dist. LEXIS 135669 at * 11 (E.D. Tex. Sept. 21, 2016).

TCL failed to meet its burden to show that Ericsson's claimed software architecture is conventional or generic. TCL's allegation that Ericsson claims nothing but a gatekeeper on a computer is belied by its failure to find any prior art invalidating the asserted claims. Indeed, TCL's expert could not even *allege* that any single prior art disclosed the claimed software architecture, and failed to prove that any combination of references disclosed the claimed architecture, which were roundly rejected by the PTAB. There can be no doubt that at some point in the prior art, a simple gatekeeper was implemented on a computer system. If the asserted claims were as simple and broad as TCL claims, then any of these references would have been invalidating. But Ericsson's claims describe far more than a simple gatekeeper; they describe a particular software architecture having separate service and application layers and an access

controller. TCL's failure to find this architecture in the prior art undeniably shows that the asserted claims describe an inventive concept. *See Cioffi*, 2017 U.S. Dist. LEXIS 8119 at *5 ("pragmatic analysis of §101 is facilitated by considerations analogous to those of §§ 102 and 103 as applied to the particular case") (citing *Internet Patents Corp. v. Active Networks, Inc.*, 790 F.3d 1343, 1347 (Fed. Cir. 2015)).

Indeed, TCL's analysis improperly disregards all limitations in claim 1 other than the security access manager holding access and permissions policies. TCL, citing no case law in support of this tactic, argues that Ericsson "acquiesced" to the patent office that this was the sole limitation not disclosed by cited reference Yanosy. But as is evident in the file history, Ericsson argued that the middleware and services in Yanosy were fundamentally different than those described in the '510 patent.[2] Ex. 1 at ERIC_TCL_EDTXIP00003144. That Ericsson combined originally filed claims 1 and 2 does not mean that Ericsson "acquiesced to the original claim 1 as anticipated by Yanosy." *See*, *e.g.*, *Woodrow Woods and Marine Exhaust Systems, Inc. v. Deangelo Marine Exhaust, Inc.*, 692 F.3d 1272 (Fed. Cir. 2012) ("[Patentee] made no statement representing that a tapered liner was not disclosed by [Reference]. He never admitted it. He never addressed it. . . .. A patent applicant is not presumed to have conceded the presence in the prior art of every claim limitation he had no reason to dispute."); *Torpharm Inc. v. Ranbaxy Pharmaceuticals, Inc.*, 336 F.3d 1322, 1330 (Fed. Cir. 2003) ("Ranbaxy's argument blurs the distinction between claims and limitations: patentability is assessed for the former, not the latter. . . A patentee is not required to fight tooth and nail every possibly adverse thought an examiner commits to paper, nor to advance redundant arguments for patentability."). Accordingly, the

---

[2] TCL may argue that Ericsson made these distinctions with respect to a different claim, but the claims Ericsson referred to were pending claims 41-47, which ultimately issued as claims 11-17. The middleware in claims 11-17 is substantially the same as the middleware described in claim 1, the only difference being that claim 11 describes a cache stored at the interception module.

15

claim should be analyzed as a whole, not based on the lone limitation singled out by TCL. Analyzing the claim as a whole, the asserted claims are valid because they claim a layered architecture including an access controller for granting and denying access to sensitive services.

Claim 1 adds other inventive concepts. For example, claim 1 provides that applications attempting to access the software services component must do so via the interface component, *even during installation of the application*. TCL's expert, Dr. Malek, failed to identify *any prior art reference* disclosing an interface to the software services component for enabling installation of applications. Ex. 2 at ¶51. Indeed, third-party applications can be just as dangerous to a user during installation and loading as during runtime. By completely segregating the applications from the services via the interface component, the '510 patent architecture ensures that applications access services via a well-defined and protected interface provided by the interface component, even during installation of the application.

Claim 1 also adds the inventive concept of a security access manager that holds access and permissions policies and determines whether requests from applications to access the software services component should be granted. Holding access and permissions policies at the decision entity provides enhanced security, as there are fewer points of vulnerability in the security architecture. TCL's analysis of the dependent claims is similarly deficient and ignores the inventive aspects of the claims. For example, claim 2 requires the request from the application to include an identification of the application making a request and the security access manager to store a collection of records of approved requesting applications. TCL's expert failed to identify a prior art system implementing a request from an application to a software services component that includes an identification of the requesting application. Ex. 2 at ¶61.

16

The remaining asserted dependent claims also add inventive concepts. For example, dependent claim 4 adds the inventive concept of a "decision cache" that is part of the security access manager and maintains records of requests by applications that have previously been granted. Because it is part of the security access manager, the cache enables the access and permissions policies to be accessed more quickly, thus improving the user experience. Therefore, the computer architecture in claim 4 goes beyond simply using generic computer concepts in a conventional way and is patent eligible. *BASCOM*, 827 F.3d at 1348 ("An inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces.").

## III.      CONCLUSION

TCL has failed to show that the '510 patent claims an abstract idea or lacks an inventive concept and thus TCL's motion for summary judgment should be denied.

Dated: August 3, 2017

**MCKOOL SMITH, P.C.**

*/s/ Theodore Stevenson III*

Theodore Stevenson III, Lead Attorney
Texas State Bar No. 19196650
tstevenson@mckoolsmith.com
David Sochia
Texas State Bar No. 00797470
dsochia@mckoolsmith.com
Warren Lipschitz
Texas State Bar No. 24078867
wlipschitz@mckoolsmith.com
Nicholas Mathews
Texas State Bar No. 24085457
nmathews@mckoolsmith.com
Mitchell R. Sibley
Texas State Bar No. 24073097
msibley@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
**MCKOOL SMITH, P.C.**
P.O. Box O
Marshall, Texas 75671
Telephone: (903) 927-2111
Telecopier: (903) 927-2622

Laurie L. Fitzgerald
Texas State Bar No. 24032339
lfitzgerald@mckoolsmith.com
Charles E. Fowler, Jr.
Texas State Bar No. 24083014
cfowler@mckoolsmith.com
Jennifer Van Dusen
Texas State Bar No. 24087087
jvandusen@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 W. 6th Street, Suite 1700
Austin, TX 78701
Telephone: (512) 692-8700
Telecopier: (512) 692-8744

18

**ATTORNEYS FOR PLAINTIFFS
ERICSSON INC., AND
TELEFONAKTIEBOLAGET LM
ERICSSON**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on August 3, 2017.

/s/ Nicholas M. Mathews
Nicholas M. Mathews

**CERTIFICATE OF CONFERENCE**

The undersigned certifies that counsel for Ericsson conferred with counsel for TCL via telephone on August 3, 2017. TCL indicated that it opposes the relief sought in this Motion.

/s/ Nicholas M. Mathews
Nicholas M. Mathews