█████████████

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| ERICSSON INC. and<br>TELEFONAKTIEBOLAGET LM ERICSSON,<br><br>                    Plaintiffs,<br><br>v.<br><br>TCL COMMUNICATION TECHNOLOGY<br>HOLDINGS, LTD., TCT MOBILE LIMITED,<br>and TCT MOBILE (US), INC.,<br><br>                    Defendants. | Civil Action No.  2:15-cv-00011-RSP<br><br>JURY TRIAL<br><br>████████████ |

## DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

# TABLE OF CONTENTS

I.      Introduction ................................................................................................... 1

II.     Legal Standard .............................................................................................. 2

III.    Argument ....................................................................................................... 2

        A.      No Reasonable Jury Could Find Infringement by TCL ......................................... 2

                1.      Ericsson Failed to Adduce Sufficient Evidence that the Alleged "Interception
                        Module" Is a Module ...................................................................................... 3

                2.      Ericsson Failed to Adduce Sufficient Evidence that the Alleged "Interception
                        Module" and "Software Services Component" Reside in Separate Layers ...... 6

        B.      No Reasonable Jury Could Find Willful Infringement by TCL ............................ 8

                1.      Ericsson Failed to Present Sufficient Evidence to Support a Finding of Willful
                        Infringement ...................................................................................................... 8

                2.      TCL's Evidence of Its Subjective Good Faith Belief in Non-Infringement
                        Refutes a Finding of Willful Infringement ..................................................... 11

        C.      Ericsson Presented A Legally Flawed Damages Theory ....................................... 12

                1.      Ericsson's Damages Model Included Unaccused Products ........................... 13

                2.      Ericsson's Damages Model Was Based Upon an Unreliable Survey ............. 13

                3.      Ericsson's Damages Model Violates the Entire Market Value Rule .............. 14

                4.      No Evidence Supports Ericsson's Royalty Rates .......................................... 16

                5.      Ericsson Improperly Used the Damages Limitation under 35 U.S.C. § 287 to
                        Increase Damages ........................................................................................ 16

IV.     Conclusion ................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398 (5th Cir. 2007) .......................................... 2

*Biscotti Inc. v. Microsoft Corp.*, No. 2:13-CV-01015-JRG-RSP, 2017 WL 2536962 (E.D. Tex. May 18, 2017)........................................................................................................................... 16

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348 (Fed. Cir. 2009) ..................... 13

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 2:15-CV-1202-WCB, 2017 WL 2190055 (E.D. Tex. May 18, 2017)........................................................................................... 11

*Fractus, S.A. v. Samsung*, No. 6:09-cv-203-LED-JDL, 2011 WL 7563820 (E.D. Tex. Apr. 29, 2011) ............................................................................................................................................ 14

*Garretson v. Clark*, 111 U.S. 120 (1884) ..................................................................................... 15

*Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508 (Fed. Cir. 1990)..................... 10

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016)................................................. 8, 10

*Hiltgen v. Sumrall*, 47 F.3d 695 (5th Cir. 1995) ............................................................................. 2

*LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012) .................... 15, 17

*Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651 (Fed. Cir. 2017) ................................. 1, 12, 13

*TCL Commc'n. Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, No. SACV 14-341 JVS(DFMx), 2017 WL 6611635 (C.D. Cal. Dec. 21, 2017).................................................... 14

*TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561 (E.D. Tex. 2007)................................................. 2

*VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308 (Fed. Cir. 2014)................................................. 13

*Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858 (Fed. Cir. 1993) ............................................. 17

*WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358 (Fed. Cir. 2016)....................... 11

*Whitserve, L.L.C. v. Computer Packages, Inc.*, 694 F.3d 10 (Fed. Cir. 2012) ............................ 16

*Wis. Alumni Research Found. v. Apple, Inc.*, 261 F. Supp. 3d 900 (W.D. Wis. 2017) ............... 11

**Statutes**

35 U.S.C. § 287(a) (2012).................................................................................................... 16, 17

TCL Communication Technology Holdings, Ltd., TCT Mobile Limited, and TCT Mobile (US), Inc. (collectively, "TCL") respectfully renew their motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b).

## I.  <u>INTRODUCTION</u>

The Court should enter judgment as a matter of law that TCL did not infringe Plaintiffs Ericsson Inc. and Telefonaktiebolaget LM Ericsson's (collectively, "Ericsson's") U.S. Patent No. 7,149,510 ("the '510 patent") because Ericsson failed to adduce legally sufficient evidence that TCL's accused products include an "interception module," as required by the asserted claims. Further, Ericsson conceded the asserted claims of the '510 patent require that the "interception module" and "software services component" be in separate layers, but Ericsson failed to adduce sufficient evidence that the accused software resides in separate layers.

At a minimum, the Court should enter judgment as a matter of law that TCL did not willfully infringe the '510 patent because there is no evidence in the record that shows that TCL's conduct was "egregious or shocking—in other words, malicious, consciously wrongful, or done in bad faith," (*see* Jury Instructions, 12/7 Trial Tr. at 28:7-10), or that rebuts evidence of TCL's subjective good faith belief of non-infringement.  The Court should also enter judgment as a matter of law of no damages given that Ericsson presented a flawed damages theory.  *See Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017) (affirming grant of JMOL of no damages and denial of new damages trial, holding that "a patent owner may waive its right to a damages award when it deliberately abandons valid theories of recovery in a singular pursuit of an ultimately invalid damages theory").  As explained in TCL's motion for a new trial under Rule 59(a), incorporated herein by reference, the evidence is legally insufficient to support a verdict of $75 million in damages.

1

## II.    <u>LEGAL STANDARD</u>

Judgment as a matter of law is appropriate where "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Hiltgen v. Sumrall*, 47 F.3d 695, 700 (5th Cir. 1995) (internal quotation marks omitted).  "A motion for judgment as a matter of law should be granted if 'there is no legally sufficient evidentiary basis for a reasonable jury to find for a party.'"  *Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 405 (5th Cir. 2007) (citing *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 486 (5th Cir. 2004)).  "A court should grant a post-judgment motion for judgment as a matter of law only when 'the facts and inferences point so strongly in favor of the movant that a rational jury could not reach a contrary verdict.'"  *Allstate*, 360 F.3d at 486 (citation omitted).  Jury findings are "reviewed under the 'substantial evidence' rule.  'Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 569 (E.D. Tex. 2007) (quoting *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1363 (Fed. Cir. 2004)).

## III.    <u>ARGUMENT</u>

### A.    <u>No Reasonable Jury Could Find Infringement by TCL</u>

No reasonable jury could find that TCL's products include an "interception module" as required by claim 1 of the '510 patent for two reasons.  First, no reasonable jury could conclude that the method steps that Ericsson's technical expert, Dr. Mark Jones, identified as satisfying the "interception module" limitation are a module.  Second, no reasonable jury could conclude that those methods resided in a layer that is separate from the software services component, which Ericsson conceded was a requirement of the '510 patent claims.

1.      Ericsson Failed to Adduce Sufficient Evidence that the Alleged
                "Interception Module" Is a Module

Ericsson failed to provide sufficient evidence that the "interception module" limitation is

met by any of the accused products.

This Court did not construe "interception module" or "module."  The only clear

definition of the term "module" was presented by TCL and its technical expert, Dr. Sam Malek.

Specifically, Dr. Malek testified that a module is a unit of program that is distinct and

identifiable with respect to loading, compilation, and its combination with other units of

programing.  12/6 AM Trial Tr. at 33:19-34:1.  As explained below, no reasonable jury could

find that the accused source code meets that definition.

Ericsson never clearly proffered a contrary definition.  The closest that Ericsson came

was the following testimony from Dr. Jones:

> Q: Dr. Jones, what's your understanding of the plain and ordinary meaning of the
> term "interception module"?
>
> A: Well, the understanding of that in the field is a lod -- logically separable part of
> the program that has an identifiable functionality.

12/6 PM Trial Tr. at 56:12-17.  Because Dr. Jones' answer makes no mention of "interception,"

he appears to have defined "module" generally.[1]  To the extent that Dr. Jones indeed intended to

proffer a competing definition of "module," no reasonable jury could find the accused source

code meets his definition either, as explained further below.

<u>Dr. Malek's Definition</u>

The evidence presented by Ericsson fails to show that the accused products satisfy the

"interception module" limitation under Dr. Malek's definition of "module."  Dr. Jones identified

---

[1] Throughout trial, Dr. Jones and Ericsson conflated "modules" generally with the "interception module" required by the claims.  *See, e.g.*, 12/6 PM Trial Tr. at 57:8-60:14 (Ericsson's attorney and Dr. Jones discussing Dr. Malek's alleged "three definitions of module" but then conceding that the first two actually related to "interception module").

several "methods" of Google Android code as the "interception module."  But as Dr. Malek

explained, methods are not discrete and identifiable with respect to compiling and loading.  12/6

AM Trial Tr. at 39:7-15; 12/6 AM Trial Tr. (Sealed) at 5:7-21.  ████████████████████

████████████████████████████████████████████████████████

██████████████████  12/6 AM Trial Tr. (Sealed) at 5:18-6:1.  Thus, no reasonable jury could

find that "methods" satisfy this definition of "module."  Ericsson's only proffered evidence on

this point was the testimony of Dr. Jones.  Here is the extent of Dr. Jones' testimony:

> Well, as I showed, it's a program unit.  And as I explained earlier, it is discrete
> and identifiable throughout the process of taking that source code from the -- from
> its -- its human-readable form all the way through to putting it into the 1s and 0s
> on the phone.

12/6 PM Trial Tr. at 60:20-24.

But no reasonable jury could credit this testimony, which renders "discrete with respect

to compiling" meaningless.  Dr. Jones suggests that source code is "discrete with respect to

compiling" if it can be located both in source code (pre-compiling) and in object code (post-

compiling).  But this is true of any compiled source code.  Thus, in Dr. Jones's view, any portion

of software—a single line of code or even less—would be "discrete with respect to compiling,"

rendering the requirement meaningless.

A reasonable jury could only credit Dr. Malek's testimony.  Source code is "discrete with

respect to compiling" only when the code is compiled independently of other code.  ██████

████████████████████████████████████████████████████████

██████████████████████████████████  12/6 AM Trial Tr. (Sealed) at

5:18-19.  Furthermore, the structure of the software persists through the compilation process.  ██

████████████████████████████████████████████████████████

██████  12/6 AM Trial Tr. (Sealed) at 13:10-15.  Thus, it is no answer, as Ericsson's attorney

and Dr. Jones suggested, that one may ignore the way in which the code is stored in files or on separate pages when printed.  12/6 PM Trial Tr. at 61:19-25.

Notably, Dr. Jones did not testify that the methods he identified are "discrete and identifiable with respect to loading." ███████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████ 12/5 AM Trial Tr. (Sealed) at 28:18-29:4.

Under Dr. Malek's definition of "module"—"a unit of program that is distinct and identifiable with respect to loading and compilation"—no reasonable jury could conclude that the accused products satisfy the "interception module" limitation.

<u>Dr. Jones' Definition</u>

Nor did Ericsson provide sufficient evidence that the accused products contain an "interception module" under Dr. Jones' definition of "module," if that is what it was: a "logically separable part of the program that has an identifiable function."

Dr. Jones testified that methods from separate files constitute a single module because "[t]hey're linked to one another through those calls that I showed in the source code, and that's how they're -- they're executed also on the phone."  12/6 PM Trial Tr. at 61:16-18.

No reasonable jury could credit this testimony.  Dr. Jones fails to apply a consistent test for "logically separable."  Dr. Jones arbitrarily identifies some method steps as part of an "interception module" while arbitrarily disregarding other, interleaved steps.  For example, for the Camera Service, Dr. Jones testified that the "interception module" includes certain steps of the "onTransact" method from lines 827 through 848 of the CameraService.cpp source code file (PX006.142).  But executed in between these steps of the "onTransact" method are other steps,

which Dr. Jones does not include what he alleges to be the "interception module."  ████

████████████████████████████████████████████████████████████████

████████████████  12/5 AM Trial Tr. (Sealed) at 5:11-22.  Dr. Jones does not

include the steps that occur during this call as part of the interception module.

Dr. Jones offers no logical reason for omitting these steps from the interception module.

And the reason he does not include them is clear: If these steps are part of the interception

module, then the accused products do not infringe because the access and permission policies

would be held by the interception module and not by a separate decision entity, as the claims of

the '510 patent require.

Beyond his own *ipse dixit*, Dr. Jones offers no reason to include or exclude various steps

from what he alleges to be the interception module.  No reasonable jury could credit Dr. Jones'

testimony that the "interception module" he identifies constitutes a "logically separable part of

the program."  Alternatively, if a jury were to accept Dr. Jones' testimony that a module is a

"logically separable" part of a program, then the jury would necessarily need to include all steps

from the beginning of the OnTransact method to the end of the OnTransact method (including

those steps during the call to the alleged Security Access Manager) as part of the interception

module.  The jury, thus, could not conclude that the access and permission policies were held by

a separate decision entity.

       2.     Ericsson Failed to Adduce Sufficient Evidence that the Alleged
                   "Interception Module" and "Software Services Component" Reside in
                   Separate Layers

According to Ericsson, the '510 patent claims are directed to a "layered" architecture.  In

particular, Dr. Jones testified that each of the software services component, interface component,

and access controller (which includes the interception module) sits within its own layer.  12/5

AM Trial Tr. at 17:3-19.  ████████████████████████████████



12/5 AM Trial Tr. (Sealed) at 38:4-9; *see also* 12/6 PM Trial Tr. at 62:20-24 (Dr. Jones testifying

that Ericsson invented "that layered architecture that I gave a high-level description of on the . . .

whiteboard over here"), 64:7-10; 12/6 AM Trial Tr. at 15:24-16:6 (Dr. Malek describing layered

architecture of '510 patent), 16:21-17:4 (same), 20:7-21:13 (same), 28:9-15 (same).

No reasonable jury could conclude that the methods that Dr. Jones identified as the

alleged "interception module" are in a layer separate from a software services component.  Dr.

Malek provided expert testimony that "there is no layer that performs an interception."  12/6 AM

Trial Tr. at 29:2-3.  Dr. Jones never testified otherwise—he never stated that the methods he

identified as an "interception module" are in a layer different from the source code that he

alleges is a software services component.

Indeed, Dr. Jones was unsure what Google Android code is the software services

component.  When asked whether certain code was part of the software services component, he

admitted that he did not know and then conceded that he did not attempt to identify the bounds of

the alleged software services component.  12/6 PM Trial Tr. at 66:10-19, 67:4-8, 67:16-24.

Given his failure to identify its outer bounds, Dr. Jones could not have testified that the software

services component resides in a different layer than the interception module.  It is hardly

surprising that he did not offer this testimony.

*   *   *

For these reasons, this Court should enter judgment as a matter of law that TCL's accused

products did not infringe the asserted claims of the '510 Patent.

**B.      No Reasonable Jury Could Find Willful Infringement by TCL**

The Court found that TCL's original motion for summary judgment of no willfulness

presented a "close call."  Dkt. No. 359 at 9.  The Court further stated that it would "carefully

monitor the evidence presented at trial."  *Id.*  In view of the evidence adduced at trial, no

reasonable jury could find that TCL willfully infringed Ericsson's '510 patent.  Not only does the

evidence adduced by Ericsson fall far short of the applicable standard, TCL's evidence of its

subjective good faith belief that it was not infringing defeats Ericsson's allegations.  The Court

should enter summary judgment of no willfulness.

As the patentee, Ericsson bears the burden of establishing willful infringement by a

preponderance of the evidence.  *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1934

(2016).  In *Halo*, the Supreme Court stressed that a willfulness finding is reserved only for

"egregious cases of misconduct beyond typical infringement" and that it requires conduct that is

"wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—

characteristic of a pirate."  *Halo*, 136 S. Ct. at 1932, 1935.  A willfulness determination is

focused on "the subjective willfulness of a patent infringer . . . without regard to whether his

infringement was objectively reckless."  *Id.* at 1933.  There is no evidence in the record on which

a reasonable jury could find that TCL's conduct was so "egregious" or pirate-like that a finding

of willfulness is warranted.

1.      Ericsson Failed to Present Sufficient Evidence to Support a Finding of
Willful Infringement

As this Court articulated in its Jury Instruction, which is in line with *Halo*, "[a] finding of

willful infringement is reserved for the most egregious or shocking cases of intentional or

culpable patent infringement" where "the accused infringer must have known about the patent,

must have known that the patent was valid, and must have known that its behavior was

infringing the patent." 12/7 Trial Tr. at 28:1-6. This Court further instructed that "the [accused]

infringer's culpable or intentional infringement behavior must have been egregious or

shocking—in other words, malicious, consciously wrongful, or done in bad faith." *Id*. at 7-10.

Ericsson adduced no evidence of such "egregious or shocking" conduct by TCL that could

support a finding of willfulness under *Halo*.

Ericsson's only purported evidence of willfulness is that certain TCL employees did not

read the '510 patent[2] and that despite the commencement of this lawsuit, TCL continued to sell

the accused products.

Let's talk about willful infringement.

*   *   *

Well, you heard from five executives of TCL by video deposition.  Not one of
them had read the patent.  None of them planned to.  And they never told you—
not one of them ever told you that they thought what they were doing by
continuing to sell pones, by ramping up their sales, by selling under the
BlackBerry name, they never told you they thought any of that was legal.

12/7 Trial Tr. at 41:21-42:2.  However, there is no requirement or duty on the part of TCL

employees to read or study the asserted '510 patent, nor did Ericsson lay any foundation that the

TCL witnesses that testified would understand the patent if they read it.  Indeed, Mr. Wodach,

TCL's senior controller, testified that he would be unqualified to offer any opinion regarding the

patent.  12/5 AM Trial Tr. at 63:4-8.  Similarly, Mr. Rodriguez, vice president of supply chain

and operations for TCL, testified that he has never dealt with patents while working at TCL and

that in his position at TCL he never has seen any documents that relate to patents in any way.  *Id.*

at 60:7-13.  Rather than have random technically-unqualified employees read the patent, TCL

---

[2] *See e.g.,* 12/5 AM Trial Tr. at 43:17-20, 45:5-8, 50:15-17.

relied on its outside counsel and experts to evaluate the patent.  Stephen Chiang, TCL's general counsel, testified that TCL relies on its outside counsel and experts for handling patent litigations.  12/5 AM Trial Tr. at 45:13-20.  Thus, the mere fact that some of the TCL employees, who were not shown would have had any understanding of the patent, did not read the '510 patent does not rise to the level of "egregious" conduct under *Halo*.

Similarly, there is no requirement that a defendant stop selling the accused products the moment a lawsuit is filed against it, especially when the defendant believes that it does not infringe the asserted patent.  *See Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 511 (Fed. Cir. 1990) ("One [need not] cease manufacture of a product immediately upon learning of a patent, or upon receipt of a patentee's charge of infringement, or upon the filing of suit [to avoid willfulness].").  Once a complaint is filed, a defendant is entitled to time to review the patent, assess defenses, and take a reasonable approach to the litigation, as TCL did here.  To hold otherwise, would mean practically every accused infringer or defendant would automatically be a willful infringer for defending itself against infringement claims.  This is exactly what the Supreme Court in *Halo* cautioned against.  *See Halo*, 136 S. Ct. at 1932 (noting that a finding of willfulness and awards of enhanced damages are "designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior" and that they "are not to be meted out in a typical infringement case").

Ericsson did not present any evidence of other "malicious, consciously wrongful, or done in bad faith" conduct by TCL such as copying or stealing.  In fact, Ericsson's corporate representative, Kjell Gustafsson, testified at trial that Ericsson is not claiming that TCL stole something from Ericsson or that TCL copied any Ericsson product.  *See* 12/4 PM Trial Tr. at 85:4-13.

This Court has granted judgment of no willfulness as a matter of law under similar facts and should do so again here.  In *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 2:15-CV-1202-WCB, 2017 WL 2190055 (E.D. Tex. May 18, 2017), the only evidence on which the patentee relied at trial to support its claim of willfulness was that the accused infringer failed to respond to its pre-suit letter which contained "barebones assertion of infringement."  *UroPep*, 2017 WL 2190055, at *2-3.  The Court, noting that there was no evidence of copying, ultimately entered judgment of no willfulness as a matter of law because "the evidence was not sufficient to support a finding that [the patentee] had met its burden of showing that [the accused infringer's] conduct was 'egregious' or 'malicious' behavior that is 'characteristic of a pirate.'"  *Id.* at *2.  The facts presented during this trial present a stronger case than *UroPep* for entering a judgment of no willfulness because in this case, there was not even a pre-suit notice of infringement.  *See* JX001.0005; 12/4 PM Trial Tr. at 84:14-17; *see also Wis. Alumni Research Found. v. Apple, Inc.*, 261 F. Supp. 3d 900, 918 (W.D. Wis. 2017) (upholding previous judgment of no willfulness as a matter of law under *Halo* where the only evidence of willfulness was pre-suit awareness of the asserted patent and there was "no evidence of copying or other egregious misconduct").

>           2.      TCL's Evidence of Its Subjective Good Faith Belief in Non-Infringement
>                   Refutes a Finding of Willful Infringement

Not only is there a dearth of evidence favoring Ericsson's willfulness allegations, TCL adduced evidence weighing against willfulness.  Indeed, the record evidence at trial does not show that TCL's conduct was "egregious . . . beyond typical infringement" but rather shows exactly the opposite.  Even after *Halo*, the objective reasonableness of the accused infringer's positions regarding non-infringement still remains relevant to the determination of willfulness.  *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1363 (Fed. Cir. 2016).

The parties agreed that TCL received actual notice of Ericsson's infringement allegations for the '510 patent on October 21, 2014, in a lawsuit filed with this Court.  JX001.0005.  Thus, the sole basis for willfulness is post-litigation knowledge.  And TCL has maintained throughout this litigation reasonable defenses, including non-infringement.  As admitted by Ericsson's own expert, Mark Jones, "TCL has always disputed that they infringed the '510 patent since the very beginning of this case" and TCL "provided an expert that says they don't infringe."  12/6 PM Trial Tr. at 63:15-64:2.  This alone demonstrates that this case is not the case of "intentional or culpable patent infringement" which requires that the accused infringer "must have known that its behavior was infringing the patent."  12/7 Trial Tr. at 28:1-6.

Moreover, the question of infringement was a close call, and the evidence reveals that the jury found this to be the case.  Jury notes



Dkt. No. 407 at 1, 4, 5.  These notes demonstrate that the jury wrestled with the issue of liability. This shows that TCL's non-infringement position, while ultimately unsuccessful, was reasonable.

### C.    Ericsson Presented A Legally Flawed Damages Theory

The Court should also enter judgment for TCL with respect to damages.  "[A] patent owner may waive its right to a damages award when it deliberately abandons valid theories of recovery in a singular pursuit of an ultimately invalid damages theory."  *Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017).  Here, Ericsson presented only legally flawed

evidence in support of damages.  As such, TCL is entitled to JMOL of no damages.  *Promega*, 875 F.3d at 664-665 (even though some infringement was admitted, legally flawed "all-or-nothing damages strategy" precluded damages).

1.    Ericsson's Damages Model Included Unaccused Products

The jury's damages verdict is based upon inadmissible evidence that should have been excluded.  By awarding lump sum damages of $75 million, the jury adopted the damages model of Ericsson's damages expert, Robert Mills.  Mr. Mills' lump sum damages model is flawed because it included sales of TCL products that are "not currently sold," are "launched a year from now," and are "not named as accused products in this case."  12/5 PM Trial Tr. at 54:3-55:7.  The damages award therefore is contrary to law.  *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1358-59 (Fed. Cir. 2009) (A patentee "can only receive infringement damages on those devices that actually performed the patented method during the relevant infringement period."); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014) ("[A] patentee must take care to seek only those damages attributable to the infringing features.").  Mr. Mills' testimony is also contradicted by the parties' stipulation that Ericsson's "claims for infringement as to" "TCL Android-based products first made available to the public on or after June 16, 2017" "will not be extinguished by a judgment for damages through the time of trial unless the product is included in Ericsson's infringement contentions."  Dkt. No. 308, ¶ 3.

2.    Ericsson's Damages Model Was Based Upon an Unreliable Survey

To calculate damages for the '510 Patent, Mr. Mills relied upon a survey designed by Dr. William Wecker, which purported to measure the percentage of sales that TCL would have lost if the accused products did not contain the allegedly infringing feature.  Dr. Wecker's survey, however, was not tied to the claims of the asserted patent.  Indeed, Ericsson's infringement expert, Dr. Mark Jones, testified that "the inventors of the '510 patent" did not invent "requiring

a user's permission before allowing an app to be installed on a phone," "preventing access to certain phone" hardware or software "without a user's permission," "access control," "app security," or "app permissions."  12/5 AM Trial Tr. at 18:13-16, 22:2-10; 12/6 PM Trial Tr. at 64:16-24.  Given the large discrepancy between the feature measured in the survey and the more limited feature actually covered by the '510 patent, the survey "do[es] not measure how consumers value the purported advantages provided by Plaintiff's technology."  *Fractus, S.A. v. Samsung*, No. 6:09-cv-203-LED-JDL, 2011 WL 7563820, at *1 (E.D. Tex. Apr. 29, 2011).  As such, the survey, and all testimony based upon it, should have been excluded.  *Id.* ("Survey evidence purportedly demonstrating the value of [a phone feature] not tied directly to Plaintiff's technology confuses the issues and must be excluded.").  Moreover, by singling out the patented access feature, the survey "artificially increases the number of people who at the moment think of [that feature] as more important."  12/6 AM Trial Tr. at 103:10-112:11; *see TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, No. SACV 14-341 JVS(DFMx), 2017 WL 6611635, at *29 (C.D. Cal. Dec. 21, 2017) (survey that "focused on one feature at a time instead of presenting the bundle of phone features consumers evaluate in reality, and also singled out certain features" was "not reliable").

### 3.   Ericsson's Damages Model Violates the Entire Market Value Rule

Compounding these errors, Mr. Mills violated the entire market value rule by using 100% of the profit of the sales that TCL purportedly would have lost by not practicing the '510 patent. Both Mr. Mills and Dr. Wecker admitted that the '510 patent's access control feature does not drive the demand for TCL's products.  12/5 AM Trial Tr. at 95:4-17; 12/5 PM Trial Tr. at 67:2-20.  Indeed, Dr. Wecker testified that there are "many," potentially "thousands" of features on a smartphone and that some of them are "majority must have" features, such as "the ability to make a phone call," "text messag[ing]," "WiFi connection," and "the camera."  12/5 AM Trial

Tr. at 90:3-9, 97:6-98:17.  Dr. Wecker also testified that customers are "not going to buy the phone" in the absence of any of those features.  *Id.*  Thus, it is undisputed that, even for 28.4% of respondents who indicated they would not have purchased a smartphone without the allegedly patented feature, the feature did not "drive[] the demand for [the] entire multi-component" accused products.  *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (that consumers would not have purchased the accused product without the patented features does not justify "damages as a percentage of revenues or *profits attributable to the entire product*") (emphasis added).

Yet, despite long-standing precedent that "the patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features," *Garretson v. Clark*, 111 U.S. 120, 121 (1884) (internal quotation marks omitted), Mr. Mills admitted that he did not "try to determine what portion of TCL's average profit per unit could be attributed to other features, like text messaging, battery life, [or] screen size."  12/5 PM Trial Tr. at 66:17-67: 20 ("No, I didn't focus on those features.").  Instead, Mr. Mills used 100% of TCL's average gross profit per unit of $12.03 associated with 28.4% of TCL's potential lost sales due to the lack of the '510 patented feature to calculate TCL's purported "at-risk" profit per unit of $3.42.  12/5 PM Trial Tr. at 13:1-15:3; *see also* 12/5 PM Trial Tr. at 62:1-10 ("you could calculate the $3.42 of at risk profit [] by taking 28.4 percent of $12.03, right?  A. That would produce the same number of 3.42, yes.").  By doing so, Mr. Mills violated the EMVR, *i.e.*, using the profits of the entire product as the royalty base, without having established that the patented feature drives the demand for the entire product.  *See LaserDynamics*, 694 F.3d at 67 (that consumers would not have purchased the accused product without the patented features does not justify "damages as a percentage of

revenues or *profits attributable to the entire product*") (emphasis added).  As such, no admissible evidence supports the jury's verdict adopting Mr. Mills' erroneous testimony.

### 4.  No Evidence Supports Ericsson's Royalty Rates

Mr. Mills concluded without basis that TCL and Ericsson would have agreed to split the value purportedly associated with practicing the patented feature with either almost all, or a little over 50%, of that value going to Ericsson.  Other than his vague analysis of the *Georgia-Pacific* factors, Mr. Mills provided no quantitative basis for this split of profit.  His arbitrary rates ranging from $1.72 to $3.41 per unit stem from no reliable methodology.  The Federal Circuit and this Court have rejected such conclusory royalty rates.  *Whitserve, L.L.C. v. Computer Packages, Inc*., 694 F.3d 10, 31 (Fed. Cir. 2012) ("[W]hile mathematical precision is not required, some explanation of both why and generally to what extent [each *Georgia-Pacific* factor] impacts the royalty calculation is needed."); *Biscotti Inc. v. Microsoft Corp*., No. 2:13-CV-01015-JRG-RSP, 2017 WL 2536962, at *4-5 (E.D. Tex. May 18, 2017) (Payne, J.) (striking "entirely conclusory" damages opinion of a 40% royalty rate as "'arbitrary' and akin to the damages model rejected in *Uniloc* and *Virnetx*").

### 5.  Ericsson Improperly Used the Damages Limitation under 35 U.S.C. § 287 to Increase Damages

Pursuant to 35 U.S.C. § 287(a), patent damages "may be recovered only for infringement occurring after . . . notice."  35 U.S.C. § 287(a) (2012).  Here, the parties stipulated that the date of the hypothetical negotiation is April 1, 2010, but due to Ericsson's failure to require marking of products that practice the '510 patent, damages could not begin until October 21, 2014, the date Ericsson provided TCL with actual notice of its infringement claims.  JX001.0005, ¶¶ 6-9; Dkt. Nos. 227, 231.  Thus, Ericsson's damages are limited by § 287(a).  Ericsson, however, used this damages limitation to increase its damages.

In calculating lump sum damages, Mr. Mills used a discount rate of 11.4%, which is the weighted average cost of capital for TCL, to reduce his calculation from 2024 to present value as of the date of payment.  12/5 PM Trial Tr. at 26:22-27:10, 56:1-57:10.  Mr. Mills, however, discounted damages for his lump sum estimate to October 21, 2014, instead of April 1, 2010, the date of the hypothetical negotiation.  *Id*.  By doing so, Mr. Mills used § 287's damages *limitation* to *increase* his damages estimate.  In fact, absent § 287's damages limitation, Mr. Mills' lump sum damages would have included accused products prior to October 2014, but would have also been discounted back to April 2010, resulting in damages $40 million to $79 million *lower* than Mr. Mills' estimated amounts.[3]  This use of § 287's damages limitation to increase damages is contrary to § 287's purpose—to limit (not increase) damages that "may be recovered only for infringement occurring after . . . notice."  35 U.S.C. § 287(a) (2012).

Mr. Mills' use of the 2014 notice date instead of the 2010 hypothetical negotiation date to reduce his calculation to present value is also contrary to binding case law.  Mr. Mills assumed that the parties at the hypothetical negotiation would recognize that damages would be limited by § 287(a).  12/5 PM Trial Tr. at 28:9-19, 56:1-57:10.  The Federal Circuit, however, has explained that § 287's legal limitation does not affect the construct of the hypothetical negotiation.  *See Wang Labs., Inc. v. Toshiba Corp*., 993 F.2d 858, 870 (Fed. Cir. 1993) (court erred when it "confused limitation on damages due to lack of notice with determination of the time when damages first began to accrue, and it is the latter which is controlling in a hypothetical royalty determination"); *LaserDynamics*, 694 F.3d at 75 ("We have . . . been careful to distinguish the hypothetical negotiation date from other dates that trigger infringement liability [such as] the six-year limitation on recovery of past damages under 35 U.S.C. § 286 [and preclusion] of damages

---

[3] *See* Declaration of Christopher Martinez In Support of TCL's Motion for New Trial and Schedules 1A, 1B, 2A, and 2B, attached thereto.

prior to the marking or notice date [under § 287.]"). Thus, Mr. Mills' use of the 2014 notice date

to limit the reduction of his lump sum damages calculation to present value is legally flawed.

## IV.    CONCLUSION

Ericsson failed to adduce sufficient evidence of infringement, which requires this Court

to grant judgment as a matter of law regarding infringement.  At a minimum, Ericsson failed to

present sufficient evidence of egregious conduct by TCL that could support a finding of

willfulness under *Halo*.  The record evidence instead demonstrates that TCL maintained

reasonable defenses—including non-infringement—which negates a finding of willfulness.  No

admissible evidence supports the jury's damages award.  Accordingly, this Court should grant

TCL's motion for judgment of no infringement, no willfulness, and no damages as a matter of

law.

Dated: January 10, 2018                    */s/ Bradford A. Cangro*
                                           Winstol D. Carter, Jr.
                                           State Bar No. 03932950
                                           wcarter@morganlewis.com
                                           Adam A. Allgood
                                           State Bar No. 24059403
                                           aallgood@morganlewis.com
                                           **Morgan, Lewis & Bockius LLP**
                                           1000 Louisiana Street, Suite 4000
                                           Houston, Texas 77002
                                           Telephone: 1.713.890.5000
                                           Facsimile: 1.713.890.5001

                                           Bradford A. Cangro (Admitted in TXED)
                                           D.C. Bar No. 495996
                                           bradford.cangro@morganlewis.com
                                           Jeremy D. Peterson (Admitted *Pro Hac Vice*)
                                           jpeterson@morganlewis.com
                                           Jacob A. Snodgrass (Admitted *Pro Hac Vice*)
                                           jacob.snodgrass@morganlewis.com
                                           **Morgan, Lewis & Bockius LLP**
                                           1111 Pennsylvania Avenue, NW
                                           Washington, D.C. 20004

Telephone: 1.202.739.3000
Facsimile: 1.202.739.3001

Michael F. Carr (Admitted *Pro Hac Vice*)
michael.carr@morganlewis.com
**Morgan, Lewis & Bockius LLP**
2 Palo Alto Square
3000 El Camino Real, Suite 700
Palo Alto, CA 94306
Telephone: 1.650.843.4000
Facsimile: 1.650.843.4001

**ATTORNEYS FOR DEFENDANTS TCL
COMMUNICATION TECHNOLOGY
HOLDINGS LTD., TCT MOBILE
LIMITED, and TCT MOBILE (US), INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has

been served on all counsel of record via e-mail on January 10, 2018.

/s/ Bradford A. Cangro
Bradford A. Cangro

## <u>CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL</u>

I hereby certify that authorization to file this document under seal was provided by the

Protective Order, Dkt. No. 39, entered in this matter.

/s/ Bradford A. Cangro
Bradford A. Cangro