## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| **ERICSSON INC., AND TELEFONAKTIEBOLAGET LM ERICSSON,** | **Civil Action No. 2:15-cv-00011-RSP** |
| **Plaintiffs,** | |
| **v.** | **JURY TRIAL** |
| **TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., TCT MOBILE LIMITED, AND TCT MOBILE (US), INC.,** | ████████████ |
| **Defendants.** | |

## ERICSSON'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

## I.      LEGAL STANDARD

When deciding motions for judgment as a matter of law, "[t]he Fifth Circuit applies an 'especially deferential' standard of review 'with respect to the jury verdict.'" *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261 (Fed. Cir. 2013) (quoting *Brown v. Bryan Cnty.*, 219 F.3d 450, 456 (5th Cir. 2000)). "The jury may only be reversed if there is no substantial evidence supporting the verdict." *Id.* "A motion for judgment as a matter of law must be denied 'unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion.'" *Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co., Ltd.*, 259 F. Supp. 3d 530, 537 (E.D. Tex. 2017). All reasonable inferences must be drawn in the light most favorable to the verdict, and all credibility determinations and weighing of evidence must be left to the jury. *Id.*

## II.     INFRINGEMENT IS SUPPORTED BY SUBSTANTIAL EVIDENCE

### a.      A reasonable jury could find that TCL's products use the claimed interception module

This was a classic battle of the experts, and a perfectly reasonable jury could credit Dr. Mark Jones' testimony, which was consistent throughout the pendency of this case, and discredit Dr. Sam Malek's trial testimony, which was inconsistent with his claim construction declaration submitted to this Court. *See Hitachi Consumer Elecs. Co. v. Top Victory Elecs. Taiwan Co.*, 2013 U.S. Dist. LEXIS 133595, at *18 (E.D. Tex. Sept. 18, 2013) ("This Court may not effectively supplant the jury's assignment of credibility or weight attributed as between the experts, as those are sole functions of the jury.").

Ericsson's infringement expert, Dr. Mark Jones, testified that the source code in the accused products "that receives the request from the app to perform the service" is the claimed interception module and that a person of skill in the art would understand this code to be a

1

"module" because it is "a logically separable part of the program that has an identifiable functionality." 12/6 PM Trial Tr. at 56:12-57:7. Critically, TCL never disputed at trial that the source code Dr. Jones identified (1) performed the claimed function or (2) was a logically separable part of the program. Rather, TCL argued for an alternative overly narrow definition of "interception module" that was inconsistent with Dr. Malek's prior claim construction declaration and rejected by the jury.

TCL argues that the jury could only credit its expert's definition of an interception module, which was "a unit of program that is distinct and identifiable with respect to loading and compilation."  The jury could have, and should have, rejected this definition as being irreconcilable with Dr. Malek's claim construction declaration to this Court, stating that the plain meaning of interception module is "software responsible for receiving a request to access the software services component from the application domain software and passing the request to the decision entity." 12/6 AM Trial Tr. at 56:23-57:22. During *Markman*, Dr. Malek's proposed claim construction included no special requirements for the software performing the claimed function, such as requiring it to be distinct and identifiable with respect to loading and compilation; it was simply "software responsible for" performing the function. *Id.* Counsel for Ericsson confronted Dr. Malek with this inconsistent position on cross-examination, and neither Dr. Malek nor TCL's attorneys justified this inconsistency to the jury. *Id.*

Even if the jury accepted the definition of "interception module" proposed at trial, Ericsson presented evidence that the accused products infringe under this definition. Dr. Jones explained that the source code is discrete and identifiable with respect to compiling, combining with other units, and loading. For example, Dr. Jones testified as follows:



12/6 PM Sealed Trial Tr. at 67:6-17. Counsel for TCL attempted to cross-examine Dr. Jones on

this point, but failed to show any flaw in Dr. Jones' logic:



12/5 AM Sealed Trial Tr. at 29:5-15. Thus, even under Dr. Malek's overly narrow definition of

"interception module," a reasonable jury could find infringement.

In its motion, TCL now introduces new attorney argument (never made at trial) that

under Dr. Jones' analysis, the "interception module" would include the "security access

manager" because the interception module calls the security access manager. Dkt. 427 at 5-6.

TCL's attorney argument is simply wrong. Dr. Jones explained that the code he identified ▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ 12/06 PM Sealed Trial Tr. at 56:15-57:7.

The "security access manager" source code, even if called by the "interception module," is not

part of the "interception module" because it performs an entirely different function. Notably,

TCL's expert, Dr. Malek, did not present TCL's attorney argument to the jury.

Further, even if the interception module and security access manager were part of the

same module, TCL would still infringe. The claim includes no limitation precluding inclusion of

3

the interception module and security access manager in the same module of source code. Contrary to TCL's new attorney argument, this would not mean that the interception module holds the access and permission policies. It was undisputed at trial that TCL's security access manager holds the access and permission policies. Including the interception module and security access manager in the same module would not change that fact.

      **b.**      **A reasonable jury could find that TCL's interception module and software services component are in separate layers**

TCL argues that Dr. Jones testified that the claim requires the interception module and security access manager to be "separate and distinct things" in "different layers." Dkt. 427 at 7. But TCL mischaracterizes Dr. Jones' testimony as being in reference to the claim when in fact it was in reference to TCL's products. The full testimony, including the omitted Q&A in italics, reads:



12/05 AM Sealed Trial Tr. at 37:25-38:9 (emphasis added). Thus, the lynchpin of TCL's argument, that Dr. Jones "never stated that the methods he identified as an 'interception module' are in a layer different from the source code that he alleges is a software services component," is contradicted by TCL's own citation to Dr. Jones' testimony.

## III.    A REASONABLE JURY COULD FIND THAT TCL'S INFRINGEMENT WAS WILLFUL

The jury was presented evidence of TCL's willfulness and no evidence to the contrary. Not a single TCL witness testified that TCL actually believed it was not infringing Ericsson's

patent. Instead, every TCL fact witness questioned at trial admitted that they did not even read Ericsson's patent, and in fact, TCL's general counsel literally laughed out loud when asked whether he intended to read the patent. *See, e.g.*, 12/05 AM Trial Tr. at 43:17-20 (Chambon, Director of TCL's Innovations Lab); 45:5-20 (Chiang, General Counsel of TCL); 50:15-17 (Cistulli, Senior VP and GM for North America); 60:14-20 (Rodriguez, VP of Supply Chain and Operations); and 62:19-63:3 (Wodach, Senior Controller).

TCL also failed to contradict Ericsson's evidence that TCL, with knowledge of its infringement, meaningfully increased the number of infringing sales while making no effort whatsoever to design-around Ericsson's patent. Indeed, Ericsson presented evidence that TCL pursued a "step-up" product strategy with the goal of selling more infringing products, more than doubling its infringing sales after learning of its infringement. 12/5 PM Trial Tr. at 30:15-40:25; PX047; PX048; PX049; PX050, PX061. Ericsson also presented evidence that TCL did not implement any design-arounds to the infringing functionality and that it never disabled the infringing feature. 12/5 AM Trial Tr. at 47:9-19, 47:25-48:21, 49:10-50:5, 51:9-13, 51:14-23, 53:21-24, 57:10-58:10; 12/6 AM Trial Tr. 64:10-65:10 ("And they certainly haven't taken this feature out of their phones, have they? A. No, they haven't."). TCL did not even present a non-infringing alternative to the jury.

Contrary to TCL's argument, the mere fact that TCL's attorneys advanced a non-infringement defense on TCL's behalf—a defense asserted in every patent case—does not negate the jury's finding of willful infringement under a "totality of the circumstances" because, as stated above, there was sufficient evidence in the record to support the jury's finding, and the jury was free to give little or no weight to the existence of TCL's defenses. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 2017 U.S. Dist. LEXIS 202298, at *23-24 (D. Del.

Dec. 8, 2017) ("Even in applying the *Seagate* standard, the Court 'underst[ood] the post-suit, reasonableness of a [party's] defenses to be only one factor among the totality of the circumstances,' and foreshadowed *Halo's* concern that 'a contrary approach to willful infringement, would negate the ability of a patentee to prove willful infringement in any hard fought and hotly contested patent litigation.' In these respects, *Halo* cannot be said to help Fairchild's cause.") (internal citation omitted). All the jury notes demonstrate is that the jury carefully considered the evidence and unambiguously found TCL's infringement to be willful.

## IV.     DAMAGES ARE SUPPORTED BY SUBSTANTIAL EVIDENCE

"There is a strong presumption in favor of affirming a jury award of damages." *Internet Machs. LLC v. Alienware Corp.*, 2013 U.S. Dist. LEXIS 115723, at \*48 (E.D. Tex. June 19, 2013). "A jury's decision with respect to an award of damages 'must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork.'" *Imperium*, 259 F. Supp. 3d at 549-50 (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1310 (Fed. Cir. 2009)).

### a.     TCL's recycled *Daubert* arguments should be rejected

At the outset, TCL's damages JMOL arguments are not properly considered as a challenge to the sufficiency of the evidence.  When the party moving for judgment as a matter of law merely recycles previously asserted and rejected *Daubert* arguments instead of addressing the sufficiency of the evidence, the JMOL should be denied. *Id.* at 449; *see Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1264 (Fed. Cir. 2013) ("Under the guise of sufficiency of the evidence, SAP questions the admissibility of Versata's expert testimony and whether his damages model is properly tied to the facts of the case. Such questions should be resolved under the framework of the Federal Rules of Evidence and through a challenge under [*Daubert*].").

TCL asserts five arguments under the guise of sufficiency of the evidence: Ericsson's

damages model (1) included unaccused products; (2) was based upon an unreliable survey; (3) violated the entire market value rule; (4) failed to justify its bargaining split; and (5) improperly used § 287 to increase damages. Reasons (1) through (4) are merely recycled *Daubert* arguments that the Court already rejected, and reason (5) should have been filed as a *Daubert* argument (and thereafter rejected on the merits). Dkt. 324 at 4-5 (survey), 6-10 (EMVR), 10-13 (bargaining split), 14 (unaccused products); Dkt. 359 at 20-21 (denying TCL's *Daubert* motion). TCL's *Daubert* arguments are not appropriate for JMOL, and should thus be rejected here. *See Versata*, 717 F.3d at 1264; *Imperium*, 259 F. Supp. 3d at 549; *see also SimpleAir, Inc. v. Google Inc.*, 77 F. Supp. 3d 569, 581-83 (E.D. Tex. 2014) (untimely *Daubert* arguments are waived).

> **b.    There is substantial evidence that the damages award is based only on products accused in this case**

Although styled as a JMOL, TCL's challenge to the $75 million verdict is effectively a request for a remittitur and should be evaluated under that standard.  *Dixon v. Int'l Harvester Co.,* 754 F.2d 573, 590 (5th Cir. 1985) (When evaluating remittitur, the Fifth Circuit requires any reduction of a jury award to be in accordance with the "maximum recovery rule," in which the Court determines the maximum amount a jury could have awarded based on the appropriate evidence.); *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1362 (Fed Cir. 2001).  TCL seeks to throw out the entire award on the grounds that a portion of it allegedly includes sales of unreleased products. Even if this were the case, the proper remedy would be remittitur, not JMOL. But any request for remittitur would fail, because as shown below the "maximum recovery" based on infringing sales of only accused products is more than the $75 million awarded by the jury.

At TCL's urging the Court charged the jury as follows: "The lump-sum royalty would have covered any past and future infringement ***involving the products Ericsson has accused in this case***." 12/7 Trial Tr. at 25:22-25 (emphasis added). *See Wellogix, Inc. v. Accenture, L.L.P.*,

716 F.3d 867, 875-76 (5th Cir. 2013) (noting the presumption that juries follow the Court's instructions). The jury followed that instruction, returning a damages verdict that is based on TCL's past and future infringement of the accused products alone, supported by substantial evidence in the trial record, which is the only question before the Court. *See Imperium*, 259 F. Supp. 3d at 550 ("The Court will grant a judgment as a matter of law on damages or a new trial only if there was insufficient evidence presented to support the jury's damages award.").

*Through-Trial Damages (Undisputed):* $61.2 million of the $75 million jury award is indisputably supported by the record and does not include any unaccused products. The undisputed royalty base of TCL accused products actually sold prior to trial was 21,415,223 units. 12/5 PM Trial Tr. at 26:3-14; 12/6 PM Trial Tr. at 14:6-15:21; PX130; PX131; PX159; PX274. Applying the upper-end royalty rate of $3.41 and present value calculation to the undisputed through-trial sales amount results in $61.2 million in damages. 12/5 PM Trial Tr. at 26:3-27:16, 45:1-7. The jury was free to give full credit to this testimony and award the full amount of through-trial damages requested by Ericsson. *See Versata Software, Inc. v. Internet Brands, Inc.*, 902 F. Supp. 2d 841, 858 (E.D. Tex. 2012).

In addition, the jury awarded $13.8 million for future sales of accused products. As explained below, there is substantial evidence in the record supporting several plausible alternative approaches that justify the jury's award of future damages, any one of which supports the jury's verdict.

*Post-Trial Damages Alternative 1:* TCL's expert Mr. Martinez projected future sales of accused products through Q1 2020, including those sales in his damages calculations. 12/6 PM Trial Tr. at 15:22-16:6, 27:3-29:14. The record shows that TCL sold 5 million accused products in 2015 and 10 million in 2016. 12/5 PM Trial Tr. at 31:9-24. Assuming the jury adopted Mr.

Mills' maximum per unit royalty of $3.41, the jury's post-verdict damages award of $13.8 million would account for future sales of less than 5 million accused products through Q1 2020 (or less than 500,000 per quarter). Based on the growing volume of TCL's actual pre-trial sales, this projection is highly conservative and substantially supported by the evidence.

*Post-Trial Damages Alternative 2:* Both experts agree that TCL sold 21,415,223 accused products during the pre-trial period (between October 2014 and just before trial). 12/5 PM Trial Tr. at 26:3-14; 12/6 PM Trial Tr. at 14:6-15:21. Thus, TCL's average sales, on a per-quarter basis, were approximately 1.78 million accused products per quarter (21,415,223 accused products/12 quarters = 1.78 million accused products per quarter). The evidence supports the reasonable inference that TCL will sell at least 17.8 million accused products per quarter (1.78 million accused products per quarter x 10 quarters = 17.8 million accused products) after trial. 12/5 PM Trial Tr. at 31:9-24 (describing TCL's *accelerating* sales of accused products). Given that 21.4 million in actual pre-trial sales supports an award of up to $61.2 million, combining actual pre-trial sales with an additional 17.8 million in projected post-trial sales easily supports the jury's award of $75 million.

*Post-Trial Damages Alternative 3:* Mr. Martinez testified that, *based on only accused products*, the lump sum payment is split 72%/28% to account for through-trial and post-trial sales ($1.77 million past and $691,000 future). 12/6 AM Trial Tr. at 145:5-20. Applying Mr. Martinez' ratio to the $75 million damages award results in $54 million for through-trial damages, and $21 million for post-trial damages. This amounts to an effective royalty rate of $3.01 per device.[1] This $3.01 per device royalty amount falls between the $1.72 to $3.41 per device royalty rate range endorsed by Mr. Mills at trial.

---

[1] Mr. Mills testified, based on actual pre-trial sales, that a $3.41 per unit royalty results in $61.2 million pre-trial damages. 12/5 PM Trial Tr. at 26:3-27:16, 45:1-7. If the jury awarded $54 million in pretrial damages, this works out to a per-unit royalty of $3.01 ($54 million/$61.2 million = $3.01 per device/$3.41 per device).

**c.**      **Dr. Wecker's survey is reliable, substantial evidence valuing the '510 patent**

This Court already has found that Dr. Wecker's survey was sufficiently "narrowly tailored" to the '510 patent to be presented to the jury. *See* Dkt. 359 at 20-21. Nothing has occurred since then to warrant a different conclusion. The Wecker survey tested the benefits of the invention compared to the next-best non-infringing alternative asserted by TCL. 12/5 AM Trial Tr. at 9:11-10:17. At trial, Dr. Malek did not even mention any non-infringing alternatives and did not offer any technical criticisms of the survey at all. The undisputed evidence at trial showed that TCL has not implemented any non-infringing alternatives (*e.g.,* design-arounds), nor do they plan to in the future. 12/5 AM Trial Tr. at 47:9-19, 47:25-48:21, 49:10-50:5, 51:9-13, 51:14-23, 53:21-24, 57:10-58:10. Because TCL did not introduce any evidence of a non-infringing alternative, a reasonable jury could conclude—based on the only evidence presented to them—that the incremental value of the '510 invention is conservatively reflected in the results of the Wecker survey. *See infra* Section IV.d. (collecting cases approving of reliance on surveys to apportion).

Nonetheless, TCL suggests the Wecker survey is flawed because it tested the *benefit* of the invention rather than the verbatim language of the claims. Dkt. 427 at 13-14.  Obviously, testing the claim language would be confusing and unworkable, and courts correctly do not require this.  12/5 AM Trial Tr. at 100:9-101:5; *Barry v. Medtronic, Inc.*, 230 F. Supp. 3d 630, 641-42, 651 (E.D. Tex. 2017) ("The court rejects the invitation to proscribe an unduly rigid rule that survey questions must recite the claim terms exactly . . . .").

Citing Dr. Dhar's testimony, TCL also complains that the survey design may have theoretically resulted in artificially increased results due to alleged focalism bias.  Dr. Wecker disputed that theory and the jury was free to credit Dr. Wecker over Dr. Dhar.  12/5 Trial Tr. 86:12-87:3, 87:20-88:2; *see also i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir.

2010) (when survey methodology is sound, disagreements go to weight); *Retractable Techs., Inc. v. Becton*, 2013 U.S. Dist. LEXIS 26996, at *5-9 (E.D. Tex. Feb. 27, 2013) (methodical flaws such as survey design go to weight, not admissibility); *Hitachi Consumer Elecs. Co.*, 2013 U.S. Dist. LEXIS 133595, at *18 ("This Court may not effectively supplant the jury's assignment of credibility or weight attributed as between the experts, as those are sole functions of the jury.").

### d.    Ericsson's apportionments do not rely on or invoke EMVR

The whole purpose of Ericsson's consumer survey was to apportion by isolating the value of the patented feature.  Ericsson did not rely on or invoke the EMVR.  Consumer surveys designed to isolate and value *just* the patented feature have been repeatedly endorsed by the courts as a best practice for apportionment. *See, e.g.*, *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015); *Apple, Inc. v. Samsung Elec. Co., Ltd.*, 2014 U.S. Dist. LEXIS 24506, at *68-76 (N.D. Cal. Feb. 25, 2014); *SimpleAir, Inc. v. Google Inc.*, 2015 U.S. Dist. LEXIS 135915, at *6-8 (E.D. Tex. Oct. 5, 2015); *Sentius Int'l, LLC v. Microsoft Corp.*, 2015 U.S. Dist. LEXIS 10423, at *12-13, 36-39 (N.D. Cal. Jan. 27, 2015). TCL's criticism that Mr. Mills did not determine what portion of TCL's average profit per unit could be attributed to other features ignores that the consumer survey isolated the value of the patented feature. 12/5 PM Trial Tr. at 66:17-67:7. And TCL's argument that Ericsson did not show that the patented feature drove demand for the products is a red herring, because whether a feature drives demand for a product is an *exception* to EMVR. As explained herein, EMVR does not apply.

Mr. Mills does not use "the profits of the entire product" as the royalty base. Dkt. 427 at 15. Mr. Mills used the results of Dr. Wecker's survey (28.4% of consumers who would not buy the phone without the infringing feature) to calculate the average at-risk profit per device if TCL replaced the infringing feature with the surveyed alternative. 12/5 PM Trial Tr. at 10:10-12:13. He then further apportioned that amount using a *Georgia-Pacific*-based bargaining analysis, and

11

only thereafter applied the resulting per-unit royalty rate ranges to a base composed of all accused products. *Id*. at 15:10-25:13. This is the antithesis of violating the entire market value rule. *See SimpleAir, Inc.*, 77 F. Supp. 3d at 580-81; *Sentius Int'l, LLC*, 2015 U.S. Dist. LEXIS 10423, at *36-39.

TCL's reliance on *Finjan* in its notice of supplemental authority is misplaced. Dkt. No. 434. *Finjan* did not even involve a consumer survey, but rather a flawed damages model based on the amount of web traffic processed by a component that performed the infringing method. Dkt. No. 434-1 (*Finjan*) at 19. In *Finjan*, the patent holder did not apportion the non-infringing and infringing functions of the accused component. *Id*. Conversely, here, the Wecker survey isolated the value of *only* the patented feature from all other features on a smartphone.

   e.   **Substantial evidence supports Ericsson's royalty rates and bargaining split**

Mr. Mills testified at length that he, in the context of his *Georgia-Pacific* analysis, (1) relied on Dr. Wecker's consumer survey results indicating that implementing the tested alternative would result in a 28.4% sales loss, 12/5 PM Trial Tr. at 9:22-11:8; (2) used the 28.4% sales loss potential, as well as TCL financial data, to calculate an average at-risk profit per unit amount of $3.42, *id.* at 12:2-15:6; and (3) relied on a *Georgia-Pacific* analysis (focusing on eight relevant factors) to simulate a bargain between Ericsson and TCL at the hypothetical negotiation, *id.* at 15:10-24:6. Mr. Mills correctly determined that Ericsson would have been the stronger of the two parties and concluded that Ericsson would have negotiated for a majority, but not all, of the $3.42 at-risk profit amount. *Id.* at 24:7-25:13; *see also Summit 6, LLC*, 802 F.3d at 1298 ("Mr. Benoit then envisioned a hypothetical negotiation in which the parties would have bargained for respective shares of the economic benefit, given their respective bargaining positions and alternatives to a negotiated agreement. Mr. Benoit's methodology was structurally sound and tied to the facts of the case."); *Sentius Int'l, LLC*, 2015 U.S. Dist. LEXIS 10423, at

*13, 31-34. The ultimate outcome of that bargain—the reasonable royalty rate used to calculate damages—was decided by the jury.

TCL's reliance on *Whitserve* and *Biscotti* is misplaced. In *Whitserve, LLC v. Computer Packages, Inc.* the excluded expert provided little more than a "conclusory remark" for each *Georgia-Pacific* factor considered. 694 F.3d 10, 31 (Fed. Cir. 2012). Mr. Mills, on the other hand, walked through each of the eight relevant *Georgia-Pacific* factors, testifying about the unique facts of the hypothetical negotiation between Ericsson and TCL. 12/5 PM Trial Tr. at 15:10-25:13. In *Biscotti*, the expert concluded that one party in the bargain would be stronger than the other, but then simply selected a 40/60 split without further analysis. *Biscotti Inc. v. Microsoft Corp.*, 2017 U.S. Dist. LEXIS 93166, at *14 (E.D. Tex. May 18, 2017). In contrast, Mr. Mills determined, based on his analysis, that Ericsson was in the stronger bargaining position and therefore entitled to the majority, but not all, of the bargaining surplus. 12/5 PM Trial Tr. at 15:10-25:13. He did not pick an arbitrary number that the parties would have agreed to, but instead presented the full range to the jury—allowing the *fact finder* to determine what the parties would have agreed to. *See Anascape, Ltd. v. Nintendo of Am., Inc.*, 2008 U.S. Dist. LEXIS 127527, at *8 (E.D. Tex. June 26, 2008) ("The determination of the amount of damages based on a reasonable royalty is an issue of fact.").

### f.      Substantial evidence supports Ericsson's present value calculations

As an initial matter, TCL waived its objection concerning Ericsson's present value calculation by failing to timely object during the *Daubert* phase or at trial. *See* Fed. R. Evid. 103*; SSL Servs., LLC v. Citrix Sys.*, 940 F. Supp. 2d 480, 492 (E.D. Tex. 2013); *Geoffrion v. Nationstar Mortg. LLC*, 182 F. Supp. 3d 648, 669 (E.D. Tex. Apr. 21, 2016) ("Usually, an issue that is raised for the first time on a motion for new trial or renewed motion for judgment as a matter of law is waived."); 12/5/2017 PM Trial Tr. at 26:15-27:10 (TCL failing to object at trial).

13

Even if not waived, Ericsson did not improperly use 35 U.S.C. § 287(a) to increase damages. The parties stipulated that (1) "TCL received actual notice of Ericsson's infringement allegations for '510 patent on October 21, 2014" and (2) "Ericsson agrees to not seek damages in this case prior to October 21, 2014." JX001. Both Mr. Mills and Mr. Martinez considered these stipulated facts as part of their damages analysis. 12/5 PM Trial Tr. at 25:16-24; 26:24-28:8; 12/6 AM Trial Tr. at 144:3-145:4, 146:12-18. Mr. Mills testified that at the 2010 hypothetical negotiation (also stipulated—JX001), the parties would have agreed to pay the lump sum damages amount in October 2014 because actual payment would not be made until 2014. 12/5 PM Trial Tr. at 56:1-57:6. For this reason, Mr. Mills determined that present value should be calculated to 2014, when the payment would be made. *Id.* Mr. Martinez disagreed, testifying that the parties would have struck a deal in 2010, and also made the lump sum payment at that time. 12/6 PM Trial Tr. at 12:14-23. This is again a classic battle of the experts, and the jury was free to credit Mr. Mills' testimony on this point. Moreover, the premise of TCL's JMOL is that the jury necessarily credited Mr. Mills and not Mr. Martinez on the discounting issues, which is unclear based on the record. The jury's award of $75M is in-between the numbers advocated by both experts and could have applied either discount value.

The case law TCL relies on is inapposite. In *Wang Labs* and *LaserDynamics*, the courts determined that the proper date of the hypothetical negotiation is the time of first infringement, not the date of notice. *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 869-70 (Fed. Cir. 1993); *LaserDynamics Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 75-76 (Fed. Cir. 2012). Mr. Mills took the same approach, testifying that the hypothetical negotiation would be in April 2010, the date of first infringement, and presenting a *Georgia-Pacific* analysis based on that date. 12/5 AM Trial Tr. at 128:18-129:11; 12/5 PM Trial Tr. at 17:1-24:6. He further opined that *discounting*

14

should not be applied until the first payment was made in October 2014—the date of notice. 12/5 PM Trial Tr. at 26:23-27:10; 56:6-57:6. This is entirely consistent with *Wang* and *LaserDynamics*, and the jury was free to credit Mr. Mills' testimony on this point over that of Mr. Martinez.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny TCL's motion for JMOL entirely.

Dated: January 24, 2018

**McKool Smith, P.C.**

*/s/  Theodore Stevenson III*

Theodore Stevenson III, Lead Attorney
Texas State Bar No. 19196650
tstevenson@mckoolsmith.com
David Sochia
Texas State Bar No. 00797470
dsochia@mckoolsmith.com
Warren Lipschitz
Texas State Bar No. 24078867
wlipschitz@mckoolsmith.com
Nicholas Mathews
Texas State Bar No. 24085457
nmathews@mckoolsmith.com
Mitchell R. Sibley
Texas State Bar No. 24073097
msibley@mckoolsmith.com
**McKool Smith, P.C.**
300 Crescent Court Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
**McKool Smith, P.C.**
P.O. Box O
Marshall, Texas 75671
Telephone: (903) 927-2111
Telecopier: (903) 927-2622

**ATTORNEYS FOR PLAINTIFFS ERICSSON INC., AND TELEFONAKTIEBOLAGET LM ERICSSON**

16

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on January 24, 2018.

*/s/ Nicholas M. Mathews*
Nicholas M. Mathews

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

I hereby certify that the authorization to file this document under seal was provided by the Protective Order, Dkt. No. 39, entered in this matter.

*/s/ Nicholas M. Mathews*
Nicholas M. Mathews