# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| **ERICSSON INC., AND TELEFONAKTIEBOLAGET LM ERICSSON,** <br><br> Plaintiffs, <br><br> v. <br><br> **TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., TCT MOBILE LIMITED, AND TCT MOBILE (US), INC.,** <br><br> Defendants. | **Civil Action No. 2:15-cv-00011-RSP** <br><br><br> **JURY TRIAL** |

### ERICSSON'S OPPOSITION TO DEFENDANTS' MOTION FOR NEW TRIAL PURSUANT TO FED. R. CIV. P. 59(a)

## I. LEGAL STANDARD

A new trial can be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). Importantly, a party must object to the evidence or argument that forms the basis of a motion for new trial to preserve error. Fed. R. Evid. 103. Objections to attorney argument are waived if the moving party fails to lodge its objections during trial or move for a mistrial before the case is submitted to the jury. *Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619 (5th Cir. 1988); *ReedHycalog UK, Ltd. v. Diamond Innovations, Inc.*, 2010 U.S. Dist. LEXIS 83011, at *12 (E.D. Tex. Aug. 12, 2010).

Examples of grounds for a new trial include the verdict being against the weight of the evidence, an excessive damages award, an unfair trial, or the existence of prejudicial error. *Luv N' Care, Ltd. v. Royal King Infant Prods. Co.*, 2016 U.S. Dist. LEXIS 86976, at *9 (E.D. Tex. July 6, 2016). While a decision to grant a new trial is within the discretion of the district court, it is not unfettered. *Id.* "A motion for a new trial should not be granted unless the verdict is against the great weight of the evidence, not merely against the preponderance of the evidence." *Dresser-Rand Co. v. Virtual Automation*, 361 F.3d 831, 838-39 (5th. Cir. 2004). And a party moving for a new trial based on the admission of certain evidence must demonstrate that any alleged prejudicial error was in fact harmful. *Sibley v. Lemaire*, 184 F.3d 481, 487 (5th. Cir. 1999).

## II. NONE OF THE EVIDENCE OR ARGUMENT PRESENTED AT TRIAL WARRANTS A NEW TRIAL

### a. The jury followed the Court's instruction and based its damages award on TCL's sales of accused products only

TCL asserts, as one ground for a new trial on damages, that the jury adopted Mr. Mills' damages model in full and completely disregarded the Court's instructions. Dkt. 429 at 3-4.

1

Nothing in the record supports these assertions. The jury's award of $75 million was less than the $245 million that Ericsson originally requested, and less than Ericsson's reduced $125 million damages request after the Court informed the parties that future unaccused sales would not be part of the damages award. Ericsson's damages request in closing was based solely on sales of accused products. *See* Dkt. 441 at 7-9. Ultimately, the jury did not fully adopt either party's damages model in full. The fact that the jury's award was in-between TCL's damages calculation and Ericsson's reduced damages calculation strongly suggests that the jury's award was based only on accused products. The record shows, as explained in Ericsson's response to TCL's JMOL, that substantial evidence supports the $75 million lump-sum award based on TCL's sales of accused products only. *See id.*

It is not surprising that substantial evidence supports the jury's award based on TCL's sales of accused products, because the jury was instructed to base its award only on accused products. *Wellogix, Inc. v. Accenture, LLP,* 716 F.3d 867, 876 (5th Cir. 2013) ("A jury is presumed to follow its instructions.") (citing *Weeks v. Angelone*, 528 U.S. 225, 234 (2000)). At TCL's request, the jury was instructed as follows:

> The parties agree that the result of that negotiation would have been a lump-sum royalty. The lump-sum royalty would have covered any past and future infringement ***involving the products Ericsson has accused in this case***. In other words, a lump-sum royalty means that Ericsson and TCL would have agreed to a paid-in-full license to make, use, sell, offer for sale, or import ***the accused products*** covered by the '510 patent for the life of that patent, which is through June 16 of 2024.

12/7 Trial. Tr. at 25:21-26:4. This instruction was repeatedly emphasized by TCL's counsel during closing argument:

- "Here's Judge Payne's instructions: A lump-sum royalty would have covered any past and future infringement involving ***the products accused -- Ericsson has accused in this case.*** Now, this is important because – because we've heard some testimony from Ericsson's expert, Mills, calculating damages not based on the accused products, okay. Not based on the accused products." 12/7 Trial Tr. at 57:1-9 (emphasis added).

2

- "Mills is including phones that are not accused, and *Judge Payne says you're only to give damages, assuming you find any, assuming you find infringement, only for the products accused in the case*. So that turns to -- us to Dr. -- excuse me, Mr. Martinez, Chris Martinez who testified yesterday. He looked at the 132 products, took their average life, took their orders. You may remember the testimony about the average life expectancy is on average 10 quarters, so that's two and a half years. He made that assumption. *And so Mr. Martinez, for those phones, $2.46 million, total for both past and future, based on the accused products, not the model that Mr. Mills uses, which includes products, not accused products in the future*." 12/7 Trial Tr. at 57:25-58:1 (emphasis added).

- "I agree, Judge Payne has told you *not to consider unaccused products*." 12/7 Trial Tr. at 58:23-24 (emphasis added).

TCL's expert based his future sales projections on sales of accused products through 2020, and in closing, Ericsson adopted that methodology. 12/6 AM Trial Tr. at 148:1-149:7; 12/6 PM Trial Tr. at 15:22-16:6, 27:3-29:14 (projecting TCL's future sales of accused products through the first quarter of 2020). Ericsson's counsel was also unequivocal during closing arguments that the jury's lump-sum award should be based only on TCL's sales of accused products *through the date that TCL's own expert advocated*. 12/7 Trial Tr. at 67:24-68:9 ("And so all that talk about we're going to charge them for unused [sic] products, that's not true. We're only going to use products that are out on the market, the Blackberry product that they're so proud of that they're making $110 a unit on in gross profit. That's what the number is. And even though Judge Payne said we could go to 2024, we're going to stop at 2020, the first quarter, as a matter of fact, and those last four years they can have for free."). The real dispute between the parties was not the future sales projections, but rather, that TCL advocated a royalty of pennies per phone, which was at odds with the true value of the feature, and which was clearly rejected by the jury as too low. Because substantial evidence supports the jury's $75 million award based on TCL's sales of accused products projected through 2020, *see* Dkt. 441 at 7-9, there is absolutely no reason to believe that the jury disregarded the Court's instruction and based its lump-sum award on anything other than the accused products.

3

### b. TCL waived its ability to seek a new trial by failing to object or seek a mistrial

TCL *never* objected during trial that any of the following was prejudicial: (1) Ericsson's $125 million damages request; (2) Ericsson's statement that it would give TCL a "free" license from 2020-2024; or (3) Mr. Mills' $245 million damages model. Nor did TCL move for a mistrial before the case was submitted to the jury. Instead, TCL chose to address these arguments on the merits, during its case-its-chief and in closing arguments. Only *after* the jury returned its verdict, and after TCL's strategy failed, did TCL change course to argue that Ericsson's arguments were unfairly prejudicial.

It is well-settled under Fifth Circuit law that TCL waived its right to request a new trial:

> [N]issho failed to object to Occidental's tactics either at the time of the argument or at a sidebar conference immediately thereafter. Instead, counsel for Nissho chose to adopt the strategy of using his final argument to rebut Occidental's improper closing argument. Nissho did not move for a mistrial before the case was submitted to the jury. . . . [R]ather, Nissho chose to submit the case to the jury. Not until its strategy failed did Nissho register its first complaint about Occidental's closing argument. Nissho is now barred 'from urging the improper arguments as grounds for a new trial after the jury has returned its verdict.'

*Nissho-Iwai Co.*, 848 F.2d at 619 (citations omitted); *see also* Fed. R. Evid. 103; *ReedHycalog UK, Ltd.*, 2010 U.S. Dist. LEXIS 83011, at *12; *z4 Techs., Inc. v. Microsoft Corp.*, 2006 U.S. Dist. LEXIS 58374, at *58 (E.D. Tex. Aug. 18, 2006).

Even if not waived, none of this testimony and argument was prejudicial, and a new trial is not warranted. Ericsson's $125 million request does not include any future sales of unaccused products because Ericsson requested only damages through the first quarter of 2020. 12/7 Trial Tr. at 67:24-68:9. This is entirely consistent with the sales projections of accused products proffered by TCL's damages expert, Mr. Martinez. 12/6 AM Trial Tr. at 148:1-149:7; 12/6 PM Trial Tr. at 15:22-16:6, 27:3-29:14 (projecting TCL's future sales of accused products through the first quarter of 2020). Further, Ericsson's statement about a "free" license from 2020-2024

4

for accused products is not improper. Because the projections of accused products ended in the first quarter of 2020, it is 100% correct that TCL would nonetheless have a "free" license to sell additional accused products, from Q2 2020 through the life of the patent, without having to pay Ericsson any additional consideration. Regarding Mr. Mills' $245 million damages calculation, any potential prejudice to TCL was cured by the Court's clear instruction to the jury to base its lump-sum damages award *only* on TCL's sales of accused products, and Ericsson's reduction of its damages prayer to correspond with the Court's instruction. *See, e.g., Chrimar Sys. v. Alcatel-Lucent Enter. USA*, 2017 U.S. Dist. LEXIS 19587, at *21-26 (E.D. Tex. Feb. 3, 2017) (holding that "carefully crafted" final instructions were sufficient to cure any harm that may have come from improper testimony).

TCL's reliance on *Uniloc* is misplaced. In *Uniloc USA, Inc. v. Microsoft Corp.,* the plaintiff's damages expert presented Microsoft's $19.28 billion gross revenue to the jury as a "check" on his primary damages calculation, which requested $565 million in damages. 632 F.3d 1292, 1311 (Fed. Cir. 2011). The Federal Circuit agreed that a new trial was warranted because the plaintiff violated the entire market value rule and skewed the damages horizon by presenting the $19 billion figure to the jury. *Id.* at 1320 ("disclosure that a company has made $19 billion dollars in revenue from an infringing product cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue.").

Here, Ericsson did not rely on the entire market value rule and did not introduce evidence of TCL's overall revenue. TCL cannot reasonably argue that the $245 million calculation presented by Mr. Mills was on the same order of magnitude as the gross revenue numbers, presented as a mere check, that skewed the jury in *Uniloc*. At most, Mr. Mills' $245 million calculation was double Ericsson's $125 million damages request in closing that was based on

5

sales of accused products. In *Uniloc*, the improper $19 billion gross revenue check was **thirty three** times higher than the plaintiff's damages ask. *Id.* at 1311. Further, as explained above, any potential prejudice was cured by the Court's instructions, both parties' closing arguments, and the unambiguous language of the verdict form making clear to the jury that its award must be based on TCL's sales of accused products only.

> c. **Ericsson's testimony and argument regarding TCL's multiple accounting methods was not prejudicial**

Ericsson presented undisputed evidence at trial that TCL presented a skewed portrayal of its profit margins for its accused products to the jury. 12/5 PM Trial Tr. at 63:1-64:19. татCL presented its $12 per unit profit number based on standard cost accounting, which is not a true gross profit margin because standard cost accounting incorporates fixed expenses that are not a true cost of goods sold. On cross examination, TCL's counsel elicited testimony from Ericsson's financial expert that TCL also calculates profit margin under a more traditional financial reporting methodology that shows much higher profits per phone. *Id.* There is nothing prejudicial about that testimony, other than the self-inflicted credibility hit when it came to light that TCL presented the jury one set of profit numbers while withholding another set of profit numbers that were higher and more applicable to TCL's true gross profit margin on each phone.

татCL objected at trial that its alternative accounting methods were outside the scope of Mr. Mills' cross-examination, but never objected on the grounds that such testimony was highly prejudicial, misleading, or inflammatory. *See id.* at 76:6-7 ("Objection, Your Honor. This set of books is outside the scope."). Because TCL failed to raise these objections at trial or move for mistrial before the case was submitted to the jury, TCL has waived its objection. *See* Fed. R. Evid. 103; *Nissho-Iwai Co.*, 848 F.2d at 619; *z4 Techs., Inc.,* 2006 U.S. Dist. LEXIS 58374, at *31.

6

Even if TCL had not waived its objection, Ericsson did not present any misleading testimony or attorney argument regarding TCL's multiple accounting methods. TCL's *own attorney* asked Ericsson's damages expert an open ended question on cross as to whether he had doubts about the accuracy of TCL's stated profit margins. Ericsson's expert gave a full and truthful answer to the question asked by TCL:

> Q. Do you have any reason to doubt that $12.03 figure?
>
> A. Yes.
>
> Q. What's that?
>
> A. Well, TCL has what it calls its standard cost accounting. And it also has something it calls its financial reporting accounting. And these are two different systems and two different ways of looking at the costs and the profit of its company. . . . [T]here are costs that are included in this standard cost accounting that really Ericsson -- or excuse me, that TCL has never paid that are to the tune of more than $50 million for some years, these royalty accruals that TCL's never paid. They just show a cost that they may have to pay some day, but they haven't paid them today. And this has been going on for -- for several years. So the $12.03 is really not the profit per unit, it's – it's the profit based on standard cost, but not the true profit.

12/05 PM Trial Tr. at 63:1-64:11. Having opened the door, Ericsson's attorney certainly was entitled to further question the witness on this point. Ericsson's counsel's colloquial expression that TCL had "two sets of books" was neither misleading nor inflammatory—it was entirely accurate based on Mr. Mills' testimony, and fairly (and correctly) conveyed to the jury that TCL had understated its gross profits for the accused products.

In addition to being factually correct, this testimony was highly relevant because it contradicted TCL's false theme that it could not afford Ericsson's requested royalty because it made only $12 in profit per phone. TCL pressed this theme throughout the case, starting with its cross-examination of Ericsson's corporate representative on the first day of trial:

> Q. Do you also agree that it would be reasonable for TCL, if it were to sell its phones, if its average profit on a phone is about $12, so after TCL sells its phone,

7

> it has $12 left, do you think it's reasonable for them to pay $3.41 of that $12 for rights to one patent, the '510 patent?
>
> A.  I do.

12/4 PM Trial Tr. at 84:22-85:3. Likewise, TCL's damages expert testified as follows:

> Again, just to recap, we have to remember, we've got $12.03 to sort of divvy up. If the royalty rate exceeds that -- and you have to think of this in the bigger picture. TCL and any handset manufacturer has to pay royalties to a number of folks that have standard essential patents, not just Ericsson.

12/06 PM Trial Tr. at 6:20-25. Mr. Mills' testimony proves this was misleading because TCL did not pay patent royalties out of the $12.03 of "standard cost" profit. Instead, TCL had reserved money to pay patent royalties, and that reserve was included in the expenses used to calculate the $12.03 "standard cost" profit. Thus, Mr. Mills' testimony was not misleading. To the contrary, Mr. Mills merely corrected a misleading position advanced by TCL.

TCL's attorney argument that TCL *only* sets patent royalties aside for standard essential patents is unsupported by the citations TCL provided, which say nothing about what patents these royalties are earmarked for. Nor has TCL put forward evidence that it is actually paying the reserved royalties to any patent holders for essential patents. Given TCL's lack of credibility and transparency on this issue, it is fair to question the veracity of TCL's self-serving categorization of those reserved funds. Further, TCL's attorney argument that "the only reason funds were reserved was due to Ericsson's breach[1] of its FRAND obligation to TCL" is made without citation to any supporting evidence and incorrect. It is undisputed that TCL does not solely set aside money for Ericsson standard essential patents.

---

[1] Contrary to TCL's suggestion, Judge Selna in the Central District of California expressly found "that Ericsson negotiated in good faith and did not commit a breach of contract by virtue of its conduct." *TCL Commun. Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, 2017 U.S. Dist. LEXIS 214003, at *180 (C.D. Cal. Nov. 8, 2017).

Ericsson was not bound to accede to TCL's unsupported and self-serving characterization of the intent of its royalty reserve in argument to the jury. If TCL wanted to straighten out the record, it could have elicited testimony from its expert or fact witnesses (TCL presented its entire case after Mr. Mills testified). The Court will recall the strenuous objections TCL's counsel made when informed that Ericsson may call its corporate representative adverse; objections that were sustained. One basis for those objections may have been TCL's desire to avoid cross-examination into the truth of how it keeps its books, and how many different accounting methods it uses for different situations.

TCL's argument that its attorneys were unprepared on this issue is not credible or relevant. Counsel has a duty to be prepared for trial on issues that might arise, and it is not grounds for a new trial that TCL's attorney asked the wrong question on cross and elicited testimony that he was not prepared to deal with. That TCL's accounting practices underlying its gross profit proclamations would be subject to scrutiny at trial was never hidden. As TCL acknowledged in its brief, these matters were in dispute between the parties at the pretrial conference, where Ericsson sought to admit documents showing some of TCL's IPR reserves, and TCL objected to them as untimely added to the exhibit list. TCL's argument that the Court excluded those documents as irrelevant and prejudicial is simply not true; they were excluded only because the Court found they were not timely added to Ericsson's exhibit list. *See* Dkt. 378 at 37:24-38:5. Further, TCL's own expert, Mr. Martinez, was aware of the issue well before trial, stating in his first expert report dated January 11, 2016 that the profits he provided were based on TCL's "Standard Cost" and stating that "Standard Cost is inclusive of IPR costs . . . ." Ex. 1 at Schedule 11 n.4. Given this history, the excuse that the trial attorneys were caught off-guard and were unprepared to address the accounting and royalty reserve issues rings hollow.

Finally, Ericsson never made any pejorative statements about the nationality of TCL's executives. This trial involved a Swedish plaintiff and its U.S. subsidiary, and Chinese defendants and their U.S. subsidiary. TCL's "standard cost" accounting is performed by a TCL Chinese affiliate, who in turn provides "standard cost" amounts to TCL's U.S. affiliate. Because both are TCL affiliates, the most convenient and understandable way to distinguish between them is by referring to them as the U.S. and the Chinese affiliate. This was not done to be pejorative, and the fact that TCL did not contemporaneously object shows that they did not view it at the time as pejorative.

On two occasions, over the course of a four day trial, Ericsson made reference to "Chinese executives." This merely referred to executives who worked for the Chinese TCL affiliate. The first complained of statement was made during the direct examination of Ericsson's damages expert in order to frame the concept of a hypothetical negotiation to the jury:

> Q. Okay. Who's going to be in the room probably? It's going to be Dr. Gustafsson here and the Chinese executives we heard about yesterday, or who is it?
>
> A. Well, it will be the -- the parties will be represented, I'm sure. I don't have a specific name that I can give you, but it's more -- it's more hypothetical because it didn't actually happen.
>
> Q. Okay. But it's somebody representing each side?
>
> A. That's correct.

12/5 AM Trial Tr. at 130:12-21. The second complained of statement was made following TCL's cross-examination of Mr. Mills, after TCL opened the door to the fact that TCL's alleged $12 profit margin was based on "standard cost" accounting and not actual profits:

> Q. You mean to tell me that those Chinese executives he talked about yesterday got two sets of books?
>
> A. Well, they have two ways of accounting for the cost, yes.
>
> Q. One way is to do that standard cost accounting, but they don't necessarily even do that right?

10

> A. Well, I can't say that it's not right. It's just that it's important to keep in mind that what's happening is that they are allocating and accruing for costs that have never been paid, and they've done that for -- for a number of years.

12/5 PM Trial Tr. at 73:9-21. Neither of these references was pejorative or made with ill-intent. To the extent TCL contends that these phrases are inherently prejudicial, this is contradicted by the fact that TCL's attorney used the phrases "Chinese companies" or "Chinese executives" at least eleven times during *voir dire*. 12/4 AM Trial Tr. at 68:18-71:16. Further, even if these phrases were interpreted to be improper (which they are not), TCL waived any argument for a new trial by failing to object at trial or move for a mistrial before the case was submitted to the jury. *See* Fed. R. Evid. 103; *Nissho-Iwai Co.*, 848 F.2d at 619; *z4 Techs., Inc.,* 2006 U.S. Dist. LEXIS 58374, at *31.

### d. TCL was not unfairly prejudiced by discussion of the Samsung license

TCL stipulated to the preadmission of the Samsung license into evidence. *See* Dkt. No. 380 (identifying PX010, the Samsung license, as being preadmitted). TCL never objected at trial to the introduction of the license as an exhibit or to any testimony concerning any aspect of the license, including the payment terms. Thus, TCL has waived any right to claim prejudice and request a new trial based on the Samsung license. *See Chrimar Sys.*, 2017 U.S. Dist. LEXIS 19587 at *20 ("ALE also did not object to this evidence and testimony regarding the licenses at trial. In fact, each of the licenses were admitted into evidence without objection. Accordingly, this argument was waived."); *Ameranth, Inc. v. Menusoft Sys. Corp.*, 2011 U.S. Dist. LEXIS 56501, at *6-11 (E.D. Tex. May 26, 2011) ("A party who stipulates to the admissibility of an evidentiary exhibit at trial waives any opportunity to object to its admission later."). The fact that TCL filed and lost a motion *in limine* does not absolve TCL of the responsibility to lodge a timely trial objection. *z4 Techs., Inc.,* 2006 U.S. Dist. LEXIS 58374, at *30-31 (holding that an order on a motion *in limine* is not a definitive ruling that preserves an objection).

11

Even if TCL had not waived this argument, the Court should deny TCL's motion because it was TCL that put the amount of the Samsung license at issue by basing its damages model on an offer for Ericsson's implementation patent portfolio, plucking that rate from a multi-billion dollar package deal offered by Ericsson during its global negotiations with Samsung for a cross-license to their entire standard essential and implementation patent portfolios, as well as a chip supply agreement. 12/06 PM Sealed Trial Tr. at 19:10-25. The magnitude of the monetary, business, and licensing consideration received by Ericsson from Samsung was directly relevant to putting into context that the offered rate for implementation patents was not Ericsson's standalone rate for that portfolio and not the rate that TCL should expect to receive or use as a comparable in this case. *See VirnetX, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) (recognizing that license comparability analyses "must account for differences in the . . . economic circumstances of the contracting parties."). In fact, at the pretrial conference, counsel for Ericsson told the Court that this was exactly the reason the full financial terms of the Samsung license should be admitted, because it showed that the rate ascribed to implementation patents and relied upon by TCL was not a standalone rate that could be accepted in isolation. Dkt. 366 at 74:20-77:5, 81:4-19 (unsealed transcript); Dkt. 367 at 3:3-4:1 (sealed transcript). The Court accepted this argument and held that the financial terms of the Samsung license, but not other licenses, would be admissible, and at trial counsel for Ericsson did not stray from its representations to the Court.

### III. MILLS' AND WECKER'S TESTIMONY WAS PROPERLY ADMITTED

#### a. Dr. Wecker's survey was sufficiently tied to the claimed invention

This Court has already found, in the context of TCL's *Daubert* challenge, that Dr. Wecker's survey was sufficiently "narrowly tailored" to the '510 patent to be presented to the jury. See Dkt. 359 at 20-21. For all the reasons stated in Ericsson's opposition to TCL's *Daubert*

12

motion and opposition to TCL's motion for JMOL, which Ericsson incorporates by reference, the same finding is warranted here. *See* Dkt. 342; Dkt. 441 at 10-11.

### b. Dr. Wecker's survey was reliably designed

Citing Dr. Dhar's testimony, TCL also complains[2] that the survey design resulted in artificially increased results, but the jury was free to credit the testimony of Dr. Wecker over that of Dr. Dhar. 12/5 Trial Tr. 86:12-87:3, 87:20-88:2; *see also i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010) (when survey methodology is sound, disagreements go to weight); *Retractable Techs., Inc. v. Becton*, 2013 U.S. Dist. LEXIS 26996, at *5-9 (E.D. Tex. Feb. 27, 2013) (methodical flaws such as survey design go to weight, not admissibility); *Hitachi Consumer Elecs. Co. v. Top Victory Elecs. Taiwan Co.*, 2013 U.S. Dist. LEXIS 133595, at *18 (E.D. Tex. Sept. 18, 2013) ("This Court may not effectively supplant the jury's assignment of credibility or weight attributed as between the experts, as those are sole functions of the jury."). The jury simply credited Dr. Wecker's testimony over Dr. Dhar's testimony—this is hardly grounds for a new trial.

### c. Damages were properly apportioned

The purpose of the consumer survey was to apportion, and numerous courts have found surveys to be an accepted methodology for apportioning. As explained in Ericsson's response to TCL's JMOL, Mr. Mills properly apportioned damages, and the entire market value rule does not apply. Dkt. 441 at 11-12. TCL makes the exact same points in its motion for a new trial, but adds a discussion of *LaserDynamics*. *LaserDynamics* is distinguishable for all of the reasons

---

[2] TCL complains that the survey "should have been excluded." Dkt. 429 at 9. To the extent TCL is arguing the survey was so prejudicial that its admission warrants a new trial, this argument is contradicted by the fact that, like the Samsung license addressed above, TCL agreed to the preadmission of the survey and survey results as trial exhibits, and made no objection to their admission during trial. *See, e.g.,* Dkt. No. 380 (identifying PX109 and PX112, the survey and survey results, as being preadmitted); *see also Chrimar Sys.*, 2017 U.S. Dist. LEXIS 19587 at *20; *Ameranth, Inc.*, 2011 U.S. Dist. LEXIS 56501, at *6-11.

13

described in Ericsson's opposition to TCL's JMOL (*e.g.,* the *LaserDynamics* plaintiff did not run a consumer survey isolating the value of the consumer survey and therefore did not properly apportion damages). Courts have routinely endorsed the use of consumer surveys as an effective tool to apportion. *SimpleAir, Inc. v. Google Inc.*, 2015 U.S. Dist. LEXIS 135915, at *7-8 (E.D. Tex. Oct. 5, 2015) (relying on a consumer survey to apportion damages); *Sentius Int'l, LLC v. Microsoft Corp.*, 2015 U.S. Dist. LEXIS 10423, at *38-39 (N.D. Cal. Jan. 27, 2015) ("Mills' income approach theory is not a hidden attempt to avoid the entire market value rule because Mills did not derive damages using Microsoft's revenue and profit from all sales of the accused products.").

### d. Mr. Mills' bargaining split analysis is supported by substantial evidence

TCL makes the exact same argument regarding Mr. Mills' bargaining split analysis in its motion for JMOL. Ericsson incorporates-by-reference its opposition thereto filed concurrently. Dkt. 441 at 12-13.

### e. Mr. Mills Accurately Calculated Present Value Damages

TCL makes the exact same argument regarding present value damages in its motion for JMOL. Ericsson incorporates-by-reference its opposition thereto filed concurrently. Dkt. 441 at 13-15.

## IV. REMITTITUR IS UNWARRANTED

"The determination of the amount of damages based on a reasonable royalty is an issue of fact." *Anascape, Ltd. v. Nintendo of Am., Inc.*, 2008 U.S. Dist. LEXIS 127527, at *8 (E.D. Tex. June 26, 2008). The jury's award "is not to be disturbed unless it is entirely disproportionate to the injury sustained." *Id.* at *5. "Only if the court is 'left with the perception that the verdict is clearly excessive' should deference to the jury be abandoned." *Id.* Further, it has long been recognized that a reasonable royalty is the damages floor rather than a ceiling or a mid-point. *Id.*

at *8 (citing 35 U.S.C. § 284). In the Fifth Circuit, even when remittitur is warranted "[t]he size of the remitted award is determined by the 'maximum recovery rule,' reducing damages to the maximum amount a reasonable jury could have awarded." *Id.* at *5.

As explained in Ericsson's response to TCL's motion for JMOL, remittitur is unnecessary because the jury's $75 million damages verdict is fully supported by substantial evidence. *See generally* Dkt. 441. As such, TCL's request to remit damages to its expert's trial ask of $2.465 million—an amount clearly rejected by the jury—should be denied.

## V. Infringement

TCL incorporates-by-reference the non-infringement arguments in its motion for JMOL. Ericsson incorporates-by-reference its opposition thereto filed concurrently. Dkt. 441 at 1-4.

## VI. Conclusion

For the foregoing reasons, the Court should deny TCL's motion for a new trial.

Dated: January 24, 2018

**MCKOOL SMITH, P.C.**

*/s/ Theodore Stevenson III*
Theodore Stevenson III, Lead Attorney
Texas State Bar No. 19196650
tstevenson@mckoolsmith.com
David Sochia
Texas State Bar No. 00797470
dsochia@mckoolsmith.com
Warren Lipschitz
Texas State Bar No. 24078867
wlipschitz@mckoolsmith.com
Nicholas Mathews
Texas State Bar No. 24085457
nmathews@mckoolsmith.com
Mitchell R. Sibley
Texas State Bar No. 24073097
msibley@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
**MCKOOL SMITH, P.C.**
P.O. Box O
Marshall, Texas 75671
Telephone: (903) 927-2111
Telecopier: (903) 927-2622

**ATTORNEYS FOR PLAINTIFFS ERICSSON INC., AND TELEFONAKTIEBOLAGET LM ERICSSON**

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on January 24, 2018.

>  */s/ Nicholas M. Mathews*
>  Nicholas M. Mathews