IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| ERICSSON INC., TELEFONAKTIEBOLAGET LM ERICSSON, §§§§§§§§§§§§§§ | Case No. 2:15-cv-00011-RSP |
| *Plaintiffs*, | |
| v. | |
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., TCT MOBILE LIMITED, TCT MOBILE (US) INC., | |
| *Defendants*. | |

## MEMORANDUM OPINION AND ORDER

A four-day jury trial in this case was held in December of 2017. During trial, Ericsson presented evidence and argument that TCL infringed claims 1 and 5 of U.S. Patent No. 7,149,510 by selling phones and devices that included the Google Android operating system. The Android operating system allows a user to grant or deny a third-party application's request to access native phone functionality, a feature that Ericsson contended was covered by the '510 patent.[1] TCL presented evidence and argument that it did not infringe, and both sides presented their respective damages theories. The jury found that TCL infringed claims 1 and 5, that TCL's infringement was willful, and awarded $75 million as a lump sum royalty. TCL has since moved for judgment as a matter of law on infringement and damages, or alternatively for a new trial on infringement and damages. TCL's motions with respect to infringement will be denied, and an order will be forthcoming. TCL's motion for a new trial on damages is granted for the following reasons.

---

[1] Additional background can be found in a prior order. *See* Dkt. No. 359.

1

# DISCUSSION

A court may order a new trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). Regional circuit law applies when considering a motion for a new trial. *z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1347 (Fed. Cir. 2007). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13 (5th Cir. 1985).

## I. Damages Evidence Presented at Trial

### A. Ericsson's Damages Theory

The damages theory Ericsson presented at trial was based on the opinions of Dr. William Wecker and Mr. Robert Mills. Dr. Wecker provided analysis of a consumer survey that according to Ericsson approximates the apportioned value of the patented invention. Mr. Mills in turn used Dr. Wecker's survey results to estimate a per phone royalty rate the parties would have agreed to at the hypothetical negotiation.

#### 1. Dr. Wecker's Survey

Dr. Wecker's survey was designed to determine how many consumers that had purchased an Android-based smartphone during the relevant time would have decided against purchasing the phone if the phone lacked the accused security and permissions feature, i.e., the ability to control whether third-party applications can access native functionality on the phone. *See* PTX 113 (survey questions); Trial Tr. 70:11-88:2, Dkt. No. 398 (Dr. Wecker direct examination). After a series of preliminary questions concerning demographic and other information, *see* PTX 113.0002-0016, survey respondents were asked whether they had purchased a new smartphone during the relevant time period, PTX 113.0017; Trial Tr. 75:21-76:16, Dkt. No. 398. About 67% of survey respondents

answered "yes" to this question, Trial Tr. 76:17-22, Dkt. No. 398, and 54% of this group of respondents had bought an Android-based phone, Trial Tr. 76:23-77:12, Dkt. No. 398; PTX 113.0018.

The next series of questions attempted to isolate the value of the accused security and permissions feature for respondents who had purchased an Android-based phone. Respondents were first asked a series of questions designed to determine whether purchasers of prepaid, low-cost TCL phones were providing answers that were consistent with the answers provided by purchasers of higher-end TCL phones. Trial Tr. 77:13-81:18, Dkt. No. 398. Dr. Wecker determined that these two groups were answering questions consistently. *Id.* Respondents were then asked whether they knew about the security and permissions feature before they purchased the phone; 67% of respondents indicated that they did. Trial Tr. 84:19-85:7, Dkt. No. 398; PTX 113.0033. Finally, these respondents were asked whether they would have purchased the phone at the same price if the phone lacked the accused security and permissions feature. Trial Tr. 85:8-86:19, Dkt. No. 398; PTX 113.0034. About 28% of respondents said they would not have purchased the phone at the same price. Trial Tr. 86:12-21, Dkt. No. 398.

### 2. Mr. Mills' Damages Opinion

Mr. Mills used Dr. Wecker's survey results to determine a per phone royalty rate. According to Mr. Mills, Dr. Wecker's survey results indicated that about 28% of consumers who purchased accused TCL phones would not have made those purchases if the phone lacked the allegedly infringing feature. Trial Tr. 9:22-11:8, Dkt. No. 400. In other words, TCL would have lost about 28% of its sales of accused Android-based phones. *Id.* 11:4-8. Mr. Mills estimated that TCL had sold about ▮▮▮▮▮▮ accused devices during the relevant time. *Id.* 13:1-10. The number of accused devices was then multiplied by 28% to give about ▮▮▮▮▮▮. *Id.* 13:11-14. According

3

to Mr. Mills, this number represents the at-risk devices, or the number of devices that would not have been sold without the allegedly infringing feature. *See id.*

Mr. Mills then arrived at a royalty rate. Mr. Mills multiplied the ▮▮▮▮ at-risk devices by TCL's average profit per device, ▮▮▮, to give about ▮▮▮▮ of at-risk profit, or profit that TCL stood to lose without the allegedly infringing feature. *Id.* 14:17-23. The at-risk profit was then divided by the total number of accused devices sold during the relevant time (▮▮▮▮) to give an at-risk profit per phone of $3.42. *Id.* 14:24-15:3. Mr. Mills' calculation was a roundabout way of multiplying 28% by TCL's average profit per device (▮▮▮), which also yields the same $3.42 in at-risk profit per phone. *Id.* 62:1-5.

Mr. Mills next determined how the parties would have split the $3.42 of at-risk profit per phone at the hypothetical negotiation. *Id.* 15:12-20. Based on eight of the fifteen *Georgia-Pacific* factors, *see* 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), Mr. Mills concluded that Ericsson would have been able to capture most of the $3.42, specifically that Ericsson would have successfully negotiated for $3.41 of the at-risk profit, Trial Tr. 17:3-44:20, Dkt. No. 400. At the very least, Ericsson would have successfully negotiated for half the at-risk profit, or $1.72 per phone. *Id.* 44:13-20.

Finally, Mr. Mills calculated a total damages award. The parties agreed that Ericsson was not entitled to damages prior to October 2014, the date Ericsson provided notice to TCL of the alleged infringement. *Id.* 25:16-24. The hypothetical negotiation, however, would have happened in 2010, just before TCL's alleged infringement began. *Id.* 27:17-28:13. Although there was no dispute that the parties would have negotiated a lump sum license, *see* Trial Tr. 145:21-146:2, Dkt. No. 402, Mr. Mills nevertheless provided calculations for both "pre-trial" and "post-trial" damages. *Id.* 25:16-29:15 (pre-trial), 29:16-44:20 (post-trial), Dkt. No. 400. For the pre-trial period

4

from October 2014 through trial, damages would range from $30.9 million (based on a $1.72 royalty rate) to $61.2 million (based on a $3.41 royalty rate). *Id.* 45:4-7. For the post-trial period from trial to when the patent expires in June 2024, *id.* 29:16-25, damages would range from $92.7 million to $183.8 million, *id.* 45:4-7. Thus, Mr. Mills estimated total damages to range from $123.6 million to $245 million. *See id.* Mr. Mills' final numbers were discounted to the value as of October 2014, *id.* 26:22-27:10, the date TCL would have paid for the lump-sum license negotiated in 2010, according to Mr. Mills. *Id.* 56:1-57:10.

### B. TCL's Damages Theory

TCL's expert, Christopher Martinez, opined that damages should not exceed $2,465,000. Trial Tr. 139:25-140:9, Dkt. No. 402. The jury heard deposition testimony from Mr. Luke McLeroy, Ericsson's former director of licensing, Trial Tr. 84:1-4, Dkt. No. 400, who indicated that Ericsson had always licensed both implementation and standard-essential patents (SEPs) together in bulk, had never licensed a single patent, and had never determined a royalty rate for a single patent, *id.* 86:5-94:4. Ericsson's practice, in other words, was to provide portfolio licenses to all the implementation and SEPs a licensee might practice. *See id.* The jury heard similar deposition testimony from John Han, Ericsson's former Vice President of patent licensing, Trial Tr. 18:5-39:18, Dkt. No. 401, and Gustav Brismark, another former Ericsson Vice President, Trial Tr. 99:4-110:6, Dkt. No. 400; Trial Tr. 7:18-16:6, Dkt. No. 401, both of whom provided testimony consistent with Mr. McLeroy's.

Mr. Martinez based his damages opinion on Ericsson's past licensing practices. Mr. Martinez analyzed a number of Ericsson licenses, many of which included a license to the '510 patent along with other Ericsson implementation patents. Trial Tr. 4:18-5:7, Dkt. No. 405. These licenses, according to Mr. Martinez, were roughly based on Ericsson's Reference Price

5

Sheets, which included royalty rates for different patent families. Trial Tr. 24:19-25:7, Dkt. No. 405; DTX 324 and 325.

One reference price sheet was dated December 9, 2011 (close to the hypothetical negotiation date). DTX 324 at 2. This early price sheet showed reference royalty rates for three patent families—patents declared essential to the 2G (or "GSM"), 3G (or "WCDMA"), and LTE standards. *Id.* Rates for the 2G portfolio ranged from $0.50 to $4 per device, or from 1.25% to 2% of net sales. *See id.* Rates for the 3G portfolio ranged from $1.50 to $6 per device, or from 1.75% to 2% of net sales. *See id.* Finally, rates for the LTE portfolio ranged from $2.5 to $8 per device, or from 2.5% to 3% of net sales. *See id.*

A later reference price sheet, dated March 30, 2015, reflected lower royalty rates. *See* DTX 325. The 2G rates ranged from $0.30 to $1.5 per device, or from 0.8% to 1.3% of net sales. *See id.* at 2. The 3G rates ranged from $0.60 to $3 per device, or from 1% to 1.5% of net sales, and the LTE rates ranged from $2 to $4.5 per device, or from 1.5% to 1.8% of net sales. *Id.* According to Mr. Martinez, royalty rates escalated from earlier to newer cellular standards because the value of technology decreases over time. Trial Tr. 24:19-25:7, Dkt. No. 405. This also explains why the later reference price sheet listed royalty rates lower than those listed in the earlier reference price sheet. *See id.*

The reference price sheets did not include any reference royalty data for implementation patents, or patents Ericsson had not declared essential to a cellular standard. *See* DTX 324 and 325; Trial Tr. 8:25-9:1, Dkt. No. 405. According to Mr. Martinez, implementation patents did not carry as much value as patents that were declared essential to a cellular standard, i.e., patents that were necessarily practiced by complying with the standard. *See* Trial Tr. 9:8-24, Dkt. No. 405. As evidence for this opinion, Mr. Martinez relied on patent licensing negotiations between Ericsson

6

and Samsung that occurred in 2011. *Id.* 6:7-18. During these negotiations, Ericsson offered to license its 2G and 3G patents for ▮▮▮▮▮▮▮▮▮▮, and offered to license its LTE patents for ▮▮▮▮▮▮▮▮▮. *See* DTX 282 at 12. This offer was consistent with Ericsson's 2011 reference price sheet. *See* DTX 324 at 2. In contrast to the essential patents, however, the implementation patents were offered for ▮▮▮▮▮▮▮▮▮▮. *Id.*

Mr. Martinez based his damages calculation on this ▮▮▮ offer. Trial Tr. 20:20-24, Dkt. No. 405. In contrast to Mr. Mills, who testified that TCL would have paid for the license in 2014, when TCL obtained notice of the alleged infringement, Mr. Martinez opined that TCL would have paid for the lump sum license in April 2010, when the hypothetical negotiation would have taken place. *Id.* In other words, Mr. Mills discounted the lump sum payment farther back in time, resulting in a lower amount. *See id.* The manner in which both experts discounted the lump sum payment, based on different payment dates, appears to be consequential. The discounted values would not be equalized by an award of prejudgment interest from the date of payment. In sum, Mr. Martinez applied the ▮▮▮ rate to sales of the accused product to arrive at $2,465,292, (reflecting a discount to April 2010). *Id.* 20:20-24.

Part of the difficulty in comparing the opinions of Mr. Mills and Mr. Martinez is that the final Ericsson license that resulted from the offer on which Mr. Martinez relied did not provide a per phone royalty amount, and the total sales covered by the license was disputed. Mr. Martinez testified that Mr. Mills' damages opinion would translate to about 3.8% of sales of accused phones. Trial Tr. 25:3-7, Dkt. No. 405. Mr. Martinez calculated this number by dividing Mr. Mills' $3.41 royalty by the average price of an accused TCL phone, ▮▮▮▮. *Id.* 23:12-19. Thus, Mr. Martinez's opinion was that Mr. Mills' $3.41 per phone royalty was about ▮-fold higher than ▮▮▮▮▮▮. *See id.*

7

Although Mr. Mills did not provide a similar comparison, Mr. Martinez's supplemental expert report referred to a statement by Mr. Mills explaining that ▮▮▮▮, based on the past Ericsson offer, would translate to a royalty of ▮▮ per phone. *See* Supp. Martinez Rep. ¶ 31 (Oct. 11, 2017). If this is correct, then Mr. Mills' damages estimate was about 8-fold higher than Mr. Martinez's estimate. Whether the difference was ▮ or ▮-fold related to a dispute about the volume of sales and prices of phones sold under the past Ericsson license relied on by Mr. Martinez. In sum, Mr. Martinez opined, assuming a ▮ fold difference between the experts, that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and that ▮▮ of sales equals $3.41 per phone. Mr. Mills' opinion, assuming a roughly ▮-fold difference between the experts, suggests that ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and 1.55% equals $3.41 per phone. The table below estimates the differences and roughly correlates percent sales values to a royalty per phone.

| Mr. Mills (assuming ▮-fold difference) | |
|---|---|
| ▮▮ ▮▮ | ▮ per phone |
| 1.55% of sales | $3.41 per phone |
| **Mr. Martinez (assuming ▮-fold difference)** | |
| ▮▮ | ▮ per phone |
| ▮ of sales | $3.41 per phone |

Beyond these estimates, it is difficult to compare Mr. Mills' opinion with Mr. Martinez's opinion, in part because Mr. Mills based his opinion on future projections which Mr. Martinez did not take into account. *See* Trial. Tr. 14:6-18:23, Dkt. No. 404. Mr. Mills estimated that between October 2014 and trial, TCL had sold about ▮▮▮▮ infringing phones, *see* Trial Tr. 26:17-22, Dkt. No. 400, and it appeared that Mr. Martinez did not significantly disagree with this estimate, *see* Trial Tr. 14:6-18:23, Dkt. No. 44. The real disagreement was about Mr. Mills' future

8

estimates—Mr. Mills estimated that post-trial, TCL would sell about 111.2 million devices that infringe the '510 patent. Trial Tr. 43:3-9, Dkt. No. 400.

The difference between Mr. Mills' opinion and Ericsson's past licensing practices is unmistakable. Even if ▮▮▮▮▮ equated to ▮▮ per phone, as Mr. Mills appears to have suggested, this ▮▮ royalty would have included a license to roughly 1,000 of Ericsson's implementation patents. *See* Trial Tr. 11:1-11, Dkt. No. 405.

The jury heard evidence regarding the nature of the past Ericsson offer and license relied on by Mr. Martinez and the differences between that license and a license Ericsson would have negotiated with TCL. Ericsson, for example, received a cross-license to the licensee's patents as part of the deal. Trial Tr. 4:12-22, Dkt. No. 401. The agreement was also a ▮▮▮▮▮, which included a license to ▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* 4:12-7:3. The licensee's ▮▮▮▮▮▮▮▮▮▮, meaning that Ericsson's total revenue from the agreement was significantly more than what Ericsson would expect from a comparable agreement with TCL. *Id.* 6:24-25. Even assuming, however, that the '510 patent constituted the entire value of the roughly 1000-patent implementation portfolio, and liberally accounting for differences in the past Ericsson license, the jury's verdict of $75 million cannot be rationalized by threading a combination of Mr. Mills' and Mr. Martinez's opinions together—unless the jury at least partially credited Mr. Mills' opinion as it related to Dr. Wecker's survey results.

## II. Reasons for a New Trial on Damages

### A. Mr. Mills' Direct Application of the Survey Results to TCL's Profit

There are at least two independent reasons why a new trial on damages is necessary. The first and most important is that the manner in which Mr. Mills used Dr. Wecker's survey results is not based on sufficient facts or data, not the product of reliable principles, and not reliably based on the facts of the case. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579

9

(1993). Namely, Mr. Mills directly translated the roughly 28% of survey respondents who allegedly would not have bought a TCL phone without the infringing feature to TCL's profit in an effort to determine the potential "at-risk" profit. This step in Mr. Mills' analysis was unreliable.

The case as originally filed, which involved five patents-in-suit, illustrates why. *See* Dkt. No. 359 at 1-7 (background). Mr. Mills opined that because roughly 28% of survey respondents said they would not have purchased a TCL phone without the accused feature, those 28% of people would not have bought the phone at all. In other words, TCL stood to lose 28% of the profit on its phones if the security and permissions feature was removed. Importantly, however, similar survey results were obtained for the formerly asserted patents-in-suit. For example, subtracting the feature allegedly covered by the '931 patent—a user's ability to move a page by scrolling a finger across the screen—would have cost TCL roughly 24% of its profit. *See* Mills Rep. ¶ 281 (November 12, 2015). Subtracting the feature allegedly covered by the '310 patent would have cost TCL another roughly 12% in profit. *See id.* According to Mr. Mills' theory, by removing three features covered by three Ericsson patents, TCL would have lost about 64% of its profit.

It is not difficult to see how this lost profit number quickly becomes unrealistic. Subtracting just three features covered by a mere three implementation patents would have allegedly cut TCL's profit by more than half. The evidence from both sides suggested that there were at least a thousand implementation patents that might cover a TCL phone. *See* Trial. Tr. 8:22-9:4, Dkt. No. 404; Trial Tr. 90:3-95:17. Regardless of the number, there is no dispute that a phone with an Android-operating system has many patented features, and that, according to Dr. Wecker's survey results, consumers would likely find numerous features essential. *See, e.g.*, Trial Tr. 90:3-95:17. According to Mr. Mills, any one of these allegedly essential features could independently be worth more than a quarter of TCL's profit on the phone. *See id.* By removing even three additional

features covered by an implementation patent, on top of the features allegedly covered by the '510, '931, and '310 patents, TCL would have lost all its profit (conservatively), according to Mr. Mills' theory.

Mr. Mills' conclusion is unreliable for at least two reasons. First, Mr. Mills did not consider the numerous patented features on the accused phones, many of which a consumer would consider essential, assuming Dr. Wecker's survey results were extrapolated. Second, Mr. Mills did not account for how his theory would result in the erosion of all of TCL's profit. Realistically, there are many features on a phone that would likely yield survey results similar to those obtained for the '510 patent, e.g., ability to make a call, text messaging, Wi-Fi connection. *See* Trial Tr. 90:3-9-98:17, Dkt. No. 398. To conclude that any one of these features—simply because it is considered essential to a consumer—could account for as much as a quarter of TCL's total profit is unreliable and does not consider the facts of the case, particularly the nature of smartphones and the number of patents that cover smartphone features.

Contrary to TCL's argument, Dr. Wecker's survey is not itself unreliable. The jury heard extensive testimony from Dr. Ravi Dhar regarding the flaws in Dr. Wecker's survey analysis, *see* Trial Tr. 96:18-118:8, Dkt. No. 402, but these alleged flaws go to the weight of the evidence, not its admissibility. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010). The survey question regarding the scope of the '510 patent claims was sufficiently tailored to what the claims purport to cover. That the survey may have been narrow, emphasizing only one of the many features consumers find important, is another argument about the weight of the survey, not its admissibility. The survey question asking whether a respondent would have purchased the phone without the infringing feature may not have been realistic, in light of the many potentially important features, but the answers to this question at least demonstrate that the feature claimed

11

by the '510 patent has value to consumers. Taking the respondents' answers to this question literally, however, leads to unreliable results.

TCL identifies the real problem with Mr. Mills' opinion, but TCL frames the issue in terms of "apportionment" and "the entire-market value rule." *See* Dkt. No. 429 at 9-12. When considering TCL's pre-trial *Daubert* motion, apportionment did not seem to be the problem because Dr. Wecker asked a reasonably specific question about the permissions feature covered by the '510 patent. It appeared that at least Dr. Wecker was considering the patented feature and thus abiding by the apportionment rule. Moreover, the fact that a respondent said they would not have purchased the phone without the infringing feature is not an indication that the infringing feature is driving the entire demand for the product. The respondents were not asked about what drove their decision to purchase the phone. Nor were they asked about many other features that might also have been essential to their purchase. The fact that these questions were not asked only suggests that the value of the feature claimed by the '510 patent cannot be as high as the survey results suggested. But the survey is at least a reliable indicator that the accused feature has importance to consumers.

### B. Unaccused Devices and Projected Future Sales

The second reason that a new trial on damages is necessary is because Ericsson presented extensive evidence at trial regarding products that were not accused in the case. Mr. Mills' damages opinion, particularly his projected 111.2 million allegedly infringing devices that would be sold in the future, included products that have never been sold nor even named as accused products in the case. *See* Trial. Tr. 54:3-55:7, Dkt. No. 54. As Mr. Mills himself testified, some products included in his opinion "don't exist" and are "not named as accused products, but – but they're part of the forecast." *Id.* 54:25-55:2.

The obvious problem with such an opinion is that it would allow a jury to award damages for devices that the jury did not find to be infringing. A patentee "can only receive infringement damages on those devices that actually performed the patented method during the relevant infringement period." *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 576 F.3d 1348, 1358-59 (Fed. Cir. 2009). In other words, a jury can only award damages for devices it finds to be infringing, which necessarily requires a tort that occurred the past, not a tort that is projected to occur in the future.

A fundamental rule of compensatory damages is that the injured party should be restored to his "rightful position." Douglas Laycock, MODERN AMERICAN REMEDIES 13 (4th ed. 2012); *Wicker v. Hoppock*, 73 U.S. 94, 99, 18 L.Ed. 752 (1867); *United States v. Hatahley*, 257 F.2d 920, 923 (10th Cir. 1958). The rightful position may be the status quo ante, such as when damages compensate an injured party for the market value of lost property. The rightful position may be slightly different when projected future loss is taken into account. When compensatory damages move an injured party beyond the status quo ante, projected future loss must be factually and proximately caused by a wrong (such as a tort) that has *already occurred*. *See, e.g.*, *Trinity Church in City of Boston v. John Hancock Mut. Life Ins. Co.*, 399 Mass. 43 (1987). Wrongs that have not yet occurred are dealt with by forward-looking remedies such as an injunction, not damages. *See generally United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1198 (D.C. Cir. 2005) (Sentelle, J.).

There is no exception to these principles in patent law. A party injured by patent infringement may be made whole either by an award of lost profits or a reasonable royalty that the party would have received through arms-length bargaining. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). The reasonable royalty may be a running royalty based on

13

"ongoing sales or usage" by the infringer. *Id.* at 1326. Or it may be a lump sum, which compensates the patent holder for both past and anticipated future infringement all at once, usually for the remainder of the patent term. *Id.* at 1324-25. Although a lump sum royalty includes compensation for projected future infringement, the patent holder must establish that but-for infringement that has already occurred with respect to a certain product, the infringer would have paid a lump sum royalty for a license to keep selling that certain product through the life of the patent. *See id.* at 1326. In other words, what the patent holder actually lost, because of a party's past infringement, was a lump sum royalty. The lump sum may be based on developments that have occurred after the date of the hypothetical negotiation, including realistic projections of future sales, *see id.* at 1333, but the lump sum must be based on a product accused in the lawsuit and found by the jury to infringe.

During argument on jury instructions, Ericsson presented the Court with two Federal Circuit cases that Ericsson contended stood for the proposition that a royalty award can cover both accused and future-released products through the life of the patent. The cases cited by Ericsson merely stand for the proposition that what the patent holder may have lost because of past infringement is a lump sum royalty through the life of the patent. Neither case contemplates a jury awarding damages for products that do not yet exist or that have never been found to infringe. *See Prism Techs., LLC v. Sprint Spectrum, L.P.*, 849 F.3d 1360, 1378-1379 (Fed. Cir. 2017); *Summit6 LLC v. Research in Motion Corp.*, 802 F.3d 1283, 1300-01 (Fed. Cir. 2015). Permitting a contrary result would ignore the most fundamental tenet of compensatory damages.

What made these issues obvious in this case was the manner in which Ericsson presented its damages case to the jury—in terms of "past" and "future" damages. *See, e.g.*, Trial Tr. 111:8-19, Dkt. No. 398. Mr. Mills' theory was phrased in terms of a lump sum royalty, but in reality it

was nothing more than a running royalty theory with a pay-it-all upfront proviso based on future projections. *See id.* Ericsson's damages theory was based on a royalty rate ($3.41 per phone) and a royalty base (███████ phone sold pretrial and 111.2 million projected to be sold post-trial), and the theory looked identical to a typical running royalty analysis. The puzzling aspect of the theory was why TCL would have agreed to pay it all at once as a lump sum. There was no evidence to justify why TCL would have agreed to pay a royalty based on a per device calculation in full as early as 2014 or 2010, when it appears TCL would have paid the same royalty on a running-basis after accounting for actual sales. *See Lucent Techs.*, 580 F.3d at 1327 (Fed. Cir. 2009) ("[T]he jury heard little factual testimony explaining how a license agreement structured as a running royalty agreement is probative of a lump-sum payment to which the parties would have agreed."). Although TCL appears to have conceded that the parties would have reached a lump-sum agreement, *see* Trial Tr. 145:21-146:2, Dkt. No. 402, TCL did not concede that the parties would have reached a lump sum agreement like the one Ericsson advanced at trial.

### III.  JMOL on Damages

As an alternative to a new trial on damages, TCL moves for judgment as a matter of law that Ericsson is not entitled to damages. Dkt. No. 427. TCL cites *Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017), for the proposition that "a patent owner may waive its right to a damages award when it deliberately abandons valid theories of recovery in a singular pursuit of an ultimately invalid damages theory." Dkt. No. 427 at 12-13. The Court disagrees that judgment as a matter of law on damages is appropriate. Although Ericsson's damages theory was flawed, sufficient evidence would have supported some damages award. TCL itself proposed a remittitur of about $2.46 million based on Mr. Martinez's damages opinion. *See* Dkt. No. 429 at 15. Given the problems with the damages evidence discussed above, a new trial on damages is the

most logical solution in the Court's view. Accordingly, TCL's motion for judgment as a matter of law on damages is denied.

### IV. Other Pending Motions

The parties have filed a number of other post-trial motions. Because the Court is ordering a new trial on damages, TCL's motion to stay execution the judgment, Dkt. No. 416, is denied as moot. TCL's motion for judgment as a matter of law on infringement, Dkt. No. 427, and alternatively TCL's motion for a new trial on infringement, Dkt. No. 429, will both be denied, and an order explaining why will be forthcoming. Ericsson's opposed motion for bill of costs, Dkt. No. 428, is denied without prejudice to reurge the motion if necessary once a new judgment is entered. Ericsson's motion to sever claims not encompassed by the jury verdict, Dkt. No. 412, is deferred. All other motions are deferred.

The Court will nevertheless provide the following guidance on a significant dispute regarding prejudgment interest. Should an award of prejudgment interest be necessary following a new trial on damages, the Court will follow the standard practice of the district, which is to award prejudgment interest at the prime rate, compounded quarterly. *See Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 2:15-CV-1202-WCB, 2017 WL 2190055, at *8 (E.D. Tex. May 18, 2017) (Bryson, J., sitting by designation) (collecting cases). The Court also intends to address the issue of when a lump sum payment would have been made. The parties should consider whether the date of payment question raises a fact issue, and whether a special question on the verdict form is necessary for the Court to make any appropriate prejudgment interest award.

### CONCLUSION

For the foregoing reasons, TCL's motion for a new trial on damages, Dkt. No. 429, is granted. Because the primary problem with the damages evidence relates to Mr. Mills' opinion, the Court will grant Ericsson and TCL leave to amend their damages reports, within reason.

The parties are ordered to meet and confer and file a proposed docket control order, including a proposed date for a new trial, within fourteen days of this order. This ruling will remain provisionally sealed until the parties file joint proposed redactions within seven days of this order, after which a redacted version will be entered.

**SIGNED this 7th day of March, 2018.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE