# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| **ERICSSON INC., AND TELEFONAKTIEBOLAGET LM ERICSSON,** <br><br> Plaintiffs, <br><br> v. <br><br> **TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., TCT MOBILE LIMITED, AND TCT MOBILE (US), INC.,** <br><br> Defendants. | **Civil Action No. 2:15-cv-00011-RSP** <br><br><br> **JURY TRIAL** |

### ERICSSON'S MOTION FOR RECONSIDERATION OF THE COURT'S ORDER GRANTING TCL'S MOTION FOR A NEW TRIAL ON DAMAGES (Dkt. No. 456)

Ericsson respectfully asks the Court to reconsider its decision to grant a new trial on damages. The Court's holding that it was unreliable for Mills to use the results of a consumer survey to calculate TCL's "at-risk" profit brings it into conflict with other courts that have endorsed this method. In fact, the Northern District of California has approved the *exact* "income approach" used by Wecker and Mills in this case. Ex. 1 (*Sentius Int'l, LLC v. Microsoft Corp,* 2015 U.S. Dist. LEXIS 10423, at *13 (N.D. Cal. Jan. 27, 2015) (cited by this Court with approval when rejecting TCL's pre-trial *Daubert* motion)).

Even if Mills' step of calculating TCL's "at-risk" profit was not reliable, the Court's Order runs afoul of the 5th Circuit's "maximum recovery rule." This rule requires the Court to consider all other evidence in the record to determine the maximum recovery the jury could have awarded. *Dixon v. Int'l Harvester Co.,* 754 F.2d 573, 590 (5th Cir. 1985). The Order focused only on Mills' calculation of TCL's at-risk profit (█████████), but did not address other admitted survey evidence that does not implicate TCL's profits. This includes the Wecker Survey's willingness to pay results ($3.52 per unit) and price sensitivity results (█████████), which independently support the full award or at least remittitur to ██ million.

Finally, with respect to unaccused products, the Order overlooks that TCL prevailed on this issue at the charge conference and instructed the jury to award damages on accused products only. For the reasons explained in Ericsson's post-trial briefing—which the Order did not address—these arguments are not grounds for a new trial.

I. PROCEDURAL AND FACTUAL BACKGROUND

   A. Wecker and Mills' Methodology

With the Federal Circuit's renewed focus on patent damages—including apportioning damages to the value of the claimed invention in complex products—various survey approaches have emerged in patent litigation. In this case, Ericsson primarily relied on the "income

1

approach," which calculates at-risk profits based on the number of sales an infringer would lose without the patented feature. Two other approaches, also introduced into evidence by Ericsson, include willingness to pay surveys targeting how much consumers would pay for the patented feature, and price-sensitivity surveys that estimate the value of the patented feature at different price points.

Using all three approaches, Dr. William Wecker conducted a survey of nearly 20,000 consumers to determine the value of being able to individually control app permissions on a mobile device—the feature enabled by Ericsson's '510 patent ("App Permissions")—by comparing it to the next-best non-infringing alternative (the "Wecker Survey"). 12/5/2017 AM Trial Tr. at 81:19-86:19; PX112.0008-10. Wecker found: (1) approximately ▮ of the respondents would not have bought their device *at the same price* without the App Permissions feature (the "willingness to buy" analysis); (2) respondents, on average, would be *willing to pay* an additional $3.52 to add the App Permissions feature to their device (the "willingness to pay" analysis); and (3) ▮ of respondents would not have bought their device *at a 5% discount* without the App Permission feature, and ▮ would not have bought at a *10% discount* (the "price sensitivity" analysis). Although the "willingness to buy" results were the focus of Wecker's trial testimony, all of the results are in the trial record as admitted evidence and were actually shown to the jury at trial. *See* 12/5/17 AM Trial Tr. 87:15-19, 105:13-24; PX109.0004.

An expert economist, Mr. Robert Mills applied the Wecker Survey's willingness to buy results ▮) to TCL's sales to determine that TCL would have lost an estimated ▮ smartphone sales if forced to replace the patent-enabled App Permissions feature with the next-best alternative. Mills concluded, based on TCL's profit margins, that without a license, TCL therefore had an "at-risk" profit of ▮. 12/5/2017 PM Trial Tr. at 13:1-14, 14:17-23.

2

He divided the at-risk profit (*not* the "at-risk revenue") by TCL's total infringing sales during the same period to identify an "at-risk profit per unit" of ▮. 12/5/2017 PM Trial Tr. at 14:24-15:6. Mills then used as the bargaining surplus for the parties' hypothetical negotiation.

### B.  Procedural History

On October 16, 2017, TCL filed a *Daubert* motion to exclude the testimony of Wecker and Mills. Dkt. No. 324. One of TCL's grounds challenged Mills' calculation of the "at-risk" profit as unreliable. *Id.* at 6-10.[1] TCL argued that by multiplying the percentage of consumers who would not purchase a device without the App Permissions feature by TCL's profits, Mills "failed to apportion between the patented and unpatented features" and allegedly violated the "entire market value rule."

In response, Ericsson cited a number of cases endorsing the methodology used by Wecker and Mills as proper apportionment, including *Sentius*, an opinion that upheld the exact same damages methodology from the exact same experts. Dkt. No. 342 at 7. On November 4, 2017, the Court denied TCL's motion, finding that "by comparing survey respondents' preferences regarding allegedly infringing and noninfringing alternatives, Mills' damages assessment sufficiently accounts for the allegedly infringing features." Dkt. No. 359 at 21 (citing *Sentius* and noting that it approved a "similar damages model").

At trial, Ericsson presented the same methodology that had been held sufficiently reliable to overcome TCL's *Daubert* challenge. In closing argument, Ericsson requested reduced damages of $125 million, which were based on TCL's actual and future sales of accused

---

[1] TCL's methodological challenges were (1) the Wecker Survey is not tied to the claimed invention; (2) Mills' calculation of damages failed to apportion between patented and unpatented features; (3) Mills provides no evidentiary basis for his split of "at-risk" profit; and (4) Mills' opinion concerning the lump sum on all of TCL's Android sales was erroneous. Dkt. No. 324. The first and third challenges did not form any basis of the Court's order for a new trial and are irrelevant to this motion. The fourth challenge—whether unaccused products should be covered by a lump-sum license—is moot as explained in §II.C, below.

3

products only.  After a four-day trial, the jury returned a verdict on December 7, 2017, finding willful infringement and awarding $75 million in damages.  Dkt. No. 390.

Following the verdict, TCL filed a Motion for New Trial (Dkt. No. 429) and a Renewed Motion for Judgment as a Matter of Law (Dkt. No. 427).  These motions merely renewed TCL's pre-trial *Daubert* challenges to the damages methodology.  On March 8, 2018, the Court granted TCL's motion for a new trial.  Although the Court found that "Dr. Wecker's survey is not itself unreliable" and that Mills' application of the Wecker Survey did not violate principles of "apportionment" or the "entire-market value rule," it nonetheless found unreliable Mills' multiplication of "the roughly ▮ of survey respondents who allegedly would not have bought a TCL phone without the infringing feature to TCL's profit in an effort to determine the potential 'at-risk' profit."  *Id.* at 10-12.[2]  The Court's new trial Order did not address the willingness to pay or price sensitivity results admitted into evidence at trial.

## II. ARGUMENTS & AUTHORITIES

### A. Mills' "Income Approach" is Reliable

#### 1. *Courts repeatedly endorse the "income approach" as reliable apportionment*

Courts have repeatedly accepted the application of willingness to buy surveys to infringer's profit margins (the "income approach") as a reliable way to apportion the value of the patented feature.  One case directly on point in *Sentius*, in which Judge Grewal of the Northern District of California rejected a *Daubert* challenge raised against Wecker and Mills' use of the *identical* "income approach" methodology used here.  2015 U.S. Dist. LEXIS 10423, at *12-14 Judge Grewal found that Wecker "established that approximately 11.2% of Microsoft consumers who purchased and used the accused products and features would not have purchased the

---

[2] The Court's Order explained that this was the "most important" of two reasons why a new trial on damages was warranted.  Order at 9.  As explained below, the second reason (the lump-sum damages base) is moot based on the Court's jury instruction and TCL's failure to seek a mistrial before submitting the case to the jury.  §II.C.

4

accused products if they had not included the accused spell and grammar check features." *Id*. at *12. Mills then multiplied the 11% willingness to buy survey result by Microsoft's profits to calculate the "at-risk" profit. *Id*. at *13. Finally, Mills applied a bargaining split to the at-risk profit. *Id*. The "income approach" methodology in *Sentius* is the *exact* methodology Wecker and Mills used in this case, including Mills' application of the Wecker Survey to identify the at-risk profit—the step that the order found unreliable.

Importantly, in *Sentius* Microsoft challenged Mills' methodology on the *same ground* raised by this Court in its new trial Order—*i.e.,* that it was unreliable to "calculate[] the profit Microsoft would have allegedly lost if it had not included the accused features in its products and then conclude[] that Microsoft would have agreed to pay Sentius 22% of that lost profit." *Id.* at *37-38. Judge Grewal rejected this argument, explaining that "[t]his interpretation not only distorts Mills' analysis, but would require exclusion of any damages analysis that is premised on the income approach theory," because "[o]ne can characterize any damages figure calculated under the income approach theory as a percentage of the defendant's total lost profit or revenue." *Id.* at *38.

The *Sentius* court also rejected Microsoft's argument that Mills' approach was "a hidden attempt to avoid the entire market value rule because Mills did not derive damages using Microsoft's revenue and profit from all sales of the accused products" and instead explained that "Mills base[d] damages only upon Microsoft's profits and revenue that is associated with sales of the accused products that Sentius conten[d]s Microsoft would have lost without the inclusion of the accused features in its products." *Id.* *38-39.

Other courts have also endorsed the income approach. *See Apple, Inc. v. Samsung Elec. (Apple II)*, 2014 U.S. Dist. LEXIS 24506, at *63-64, *90-96 (N.D. Cal. Feb. 25, 2014)

5

(approving damage expert's reliance on a willingness to buy survey to quantify the "proportion of Samsung customers who would not have purchased Samsung smartphones if they lacked one or more of the patented features," even though the analysis resulted in a per-unit royalty rate of more than $12 per device for a single patent covering embedded quick links);[3] *Lucent Techs., Inc. v. Microsoft Corp.,* 837 F. Supp. 2d 1107 (S.D. Cal. Nov. 10, 2011) (holding damages methodology reliable where consumer survey showed that Microsoft would lose 3% of its sales of Microsoft Outlook without the patented feature, and expert then multiplied 3% by Microsoft's Outlook sales to "obtain the number of license sales Microsoft would potentially lose if the [patented] technology was not included in Outlook.").[4, 5]

The repeated endorsement of the "income approach" indicates its soundness. Where reliable evidence (*e.g.,* the Wecker Survey) shows that an infringer will lose ▇ of its sales by replacing the patented feature with the next-best alternative, then the value of the invention to the infringer is the profits it stands to lose without those sales. By holding that Mills' reliance on that evidence was unreliable, the Court departed from the line of cases approving this exact approach. Order at 10. The *Sentius, Lucent* and *Apple II* courts expressed no such concern in

---

[3] In *Apple II*, Apple sought $1.12 billion in reasonable royalty damages, based on a $33 per unit royalty, associated with five patents related to smartphone features such as "slide to unlock," "background sync," "quick links," and "universal search." Ex. 2 at 1321:2-25; *Apple, Inc. v. Samsung Elecs. Co.*, 67 F. Supp. 3d 1100, 1107, 1110, 1116 (N.D. Cal. 2014) (describing the patented features).

[4] The court did order remittitur because the damages methodology included an inherently unreliable $67 per-unit valuation of Microsoft Outlook (which implemented the patented feature), even though the total cost of Microsoft Office (which also included Word, Excel and PowerPoint.) was just $98. *Lucent Techs.,* 837 F. Supp. 2d at 1121-22. This criticism was unrelated to any survey evidence and is irrelevant to Mills' analysis in this case.

[5] Other courts have approved the income approach. *See Numatics, Inc. v. Balluff, Inc.*, 66 F. Supp. 3d 934, 954-56 (E.D. Mich. 2014) ("The Federal Circuit has approved the income or analytic approach."); *Apple, Inc. v. Samsung Elec. (Apple I)*, No. 11-cv-01846, 2012 U.S. Dist. LEXIS 90877, at *32-35 (N.D. Cal. June 29, 2012) ("First, while Samsung may disagree with Mr. Musika's apportionment of any premium for Apple's iPhone and iPad products, his basic income approach methodology is sound and is not subject to exclusion under FRE 702 and *Daubert*."). In fact, this Court has sanctioned the use of the income approach, holding that the application of consumer survey results to an infringer's revenue was an acceptable means to "apportion damages between patented and non-patented features." *Droplets, Inc. v. Overstock.com, Inc.*, No. 2:11-CV-401-JRG-RSP, 2015 U.S. Dist. LEXIS 189117, at *6-7 (E.D. Tex. Jan. 7, 2015).

6

rejecting these exact challenges to the "income approach," and instead allowed the jury to weigh the evidence and return a damages verdict.

2. *Wecker and Mills considered all of the other features on the Accused Products*

The Order finds Mills' income approach problematic because "Mills did not consider the numerous patented features on the accused phones, many of which a consumer would consider essential." Order at 10. This is not correct. The *very purpose* of the Wecker Survey was to take into account other patented features on the Accused Products by measuring the marketplace consequences TCL would face it if removed *only the patented features but left all other features as-is*. Mills further accounted for other features by applying Wecker's results to the total at-risk *profits*—rather than the at-risk *revenue*—thereby accounting for TCL's costs associated with other components of the Accused Products (such as license fees for other patents paid either by TCL or its component suppliers). It is unclear how Mills could have *further* apportioned for other features.[6]

3. *TCL's profit margin is not a cap on royalties and, in any event, Mills accounted for "royalty stacking"*

The Order also states that "Mills did not account for how his theory would result in the erosion of all of TCL's profits," Order at 11,[7] but "[i]t is settled law that an infringer's net profit

---

[6] The Order concludes that the fact Wecker did not "ask[] about what drove their decision to purchase the phone … suggests that the value of the feature claimed by the '510 patent cannot be as high as the survey results suggested." *Id*. at 12. But Ericsson is not calculating its royalty on the total profits or revenue of the accused device—thus not implicating EMVR—so there was no reason to ask these questions. To the extent the Court's concerns are with the Wecker Survey itself, such criticism goes to weight, not admissibility. *Scott Fetzer Co. v. House of Vacuums Inc.,* 381 F.3d 477, 488 (5th Cir. 2004) ("[M]ethodological flaws in a survey bear on the weight the survey should receive, not the survey's admissibility.").

[7] The Court's Order references the Wecker Survey results for the formerly-asserted '310 and '931 patents (which have since been invalidated in IPR), and holds that "[a]ccording to Mr. Mills' theory, by removing three features covered by three Ericsson patents, TCL would have lost about ▬ of its profit" and that such a "lost profit number quickly becomes unrealistic." Mot. at 10. This is not correct. As set forth in the Wecker report, the lost sales when three features are removed individually do not add to the number of lost sales if all three features were removed collectively. Ex. 3 (Wecker Report) at Table 4 (showing lost profit margin with three features removed being less than the sum of each individually). Mr. Mills considered this in his analysis. Ex. 4 (Mills Report) at ▬.

7

margin is not the ceiling by which a reasonable royalty is capped." *Powell v. Home Depot USA Inc.,* 663 F.3d 1221, 1238 (Fed. Cir. 2011) (citing *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1338 (Fed. Cir. 2004) (affirming $31.80 royalty, which was *four times* the infringer's profit margin for the accused device)). If this were not the law, an infringer who elects to sell at low margins to take market share from its competitors— ▮▮▮▮▮▮▮▮▮▮▮ —could shield itself from paying a reasonable royalty for its infringement. It is unsurprising, then, that courts approving the income approach have not expressed a "profit erosion" concern. *See supra* (discussing *Sentius, Apple,* and *Lucent*).

The Order essentially raises the "royalty stacking" concern hypothetically present in every patent case.[8] But this concern is entirely speculative given TCL *never* presented proof of other patents it would have to license. The Federal Circuit has held that this type of evidentiary shortcoming is fatal, holding that "[t]he district court need not instruct the jury on hold-up or stacking unless the accused infringer presents evidence of hold-up or stacking. Certainly something more than a general argument that these phenomena are possibilities is necessary." *Ericsson v. D-Link,* 773 F.3d 1201, 1234 (Fed. Cir. 2014); *see also Commonwealth Sci. & Indus. Research Org. v. Cisco Sys.,* 809 F.3d 1295, 1303 (Fed. Cir. 2015) ("[A]bstract recitations of royalty stacking theory, and qualitative testimony that an invention is valuable—without being anchored to a quantitative market valuation—are insufficiently reliable.").

The Order suggests that the law gives an infringer the power to determine the size of the royalty pie based on the price the infringer chooses to set for its products. The premise of the Court's Order is that the royalty pie would then be hypothetically divided among all other

---

[8] It is certainly the case that there are other patents in existence that cover Microsoft's software (*Sentius* and *Lucent*) and Samsung's Android phones (*Apple II*), but that did not deter other courts from approving an "income approach" damages model.

8

hypothetically infringed patents. The result being that any patent holder who prevails in a lawsuit is relegated to a small, divided sliver of the royalty pie, while the infringer keeps the remainder (for the other hypothetically infringed patents). The problem with this reasoning is that the more patents the defendant infringes (or claims to theoretically infringe), the smaller each patent holder's royalty becomes. If an infringer chooses to sell its products at a loss, or give it away for free, a patent owner would not be entitled to a royalty at all. These issues are exactly why "[i]t is settled law that an infringer's net profit margin is not the ceiling by which a reasonable royalty is capped." *Powell,* 663 F.3d at 1238.

Yet this is exactly what TCL's damages expert attempted to argue from the witness stand. He testified—contrary to settled law—that "[i]f TCL's profit were $12, if it were a pie," TCL would not "give away more than that pie to pay for royalties." 12/6/2017 PM Trial Tr. at 8:3-14. TCL's damages expert *never* identified any specific patent or feature that TCL would *also* be required to pay royalties on. Despite the Federal Circuit's clear admonition in *D-Link* and *CSIRO*, TCL did not come forward with any evidence that it cannot afford to pay Ericsson a ▇/unit royalty for the '510 patent because it infringes and owes royalties for "thousands" of unspecified patents covering other features on its products. TCL never identified, for example, what those patents are, which features they cover, the amount of unpaid royalties that are owed, or to whom. Yet, in granting a new trial, the Court accepted TCL's speculative argument by referencing other features such as the "ability to make a call, text messaging, Wi-Fi connection." Order at 11. The implication of the Court's Order is that infringers may defeat damages as a matter of law by claiming the royalty is simply too high in view of unspecified "other" patents that may cover their products, while never presenting any actual evidence of what those patents or costs are.

### B.  The Order Does Not Consider Other Admitted Survey Evidence, In Violation Of The Maximum Recovery Rule

Even if the Court was correct to disregard Mills' income approach, the Court erred in granting a new trial without considering whether other evidence in the record supports the jury's verdict. If the evidence supports alternative calculations of damages, the Court must "uphold the award if there is substantial evidence in the record as to any one calculation to support the award." *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1373 (9th Cir. 1987); *Dixon*, 754 F.2d at 590. And, in a case where the evidence supports an award less than actually awarded by the jury, the Court "must suggest a remittitur." *Dixon,* 754 F.2d at 590. In case of a remittitur, the "maximum recovery rule" requires that the court "remit[] an excessive jury award to the *highest amount* the jury could 'properly have awarded based on the relevant evidence.'" *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1362 (Fed. Cir. 2001) (emphasis added) (quoting *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995)); *Knight v. Texaco*, 786 F.2d 1296, 1299-300 (5th Cir. 1986). In this case, the new trial Order did not consider (1) the Wecker Survey's willingness to pay results, which support the full verdict, or (2) the Wecker Survey's price sensitivity results, which support remittitur to at least ███ million.

1.  *Wecker's "willingness-to-pay" analysis supports the jury's $75 million award*

The Wecker Survey determined that an average consumer would be willing to pay $3.52 more for a device with the infringing App Permissions feature than for a device with the next-best non-infringing alternative.[9] ████████████████████████████████ ████████████████████████████ per device calculated by Mills' income approach. These results were admitted into evidence as an exhibit that was shown to the

---

[9] Courts routinely accept willingness to pay surveys as reliable evidence to support a damages award. *See SimpleAir, Inc. v. Google Inc.*, 2015 U.S. Dist. LEXIS 135915, at *6-8 (E.D. Tex. Oct. 5, 2015); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1020-22 (N.D. Cal. Mar. 1, 2013); *Apple, Inc. v. Samsung Elec. (Apple I)*, 2012 U.S. Dist. LEXIS 90877, at *37-39 (N.D. Cal. June 29, 2012).

10

jury during the course of the trial. PX109.0004; 12/5/17 AM Trial Tr. 105:13-24. The willingness to pay results independently support a damages award of at least the $75 million awarded by the jury. Importantly, the Court found the Wecker Survey itself reliable. Order at 11-12. Because the Wecker Survey's willingness to pay results were not multiplied with TCL's profit margins (the step the Court found to be unreliable), none of the concerns in the Court's Order are implicated.

Because "there is substantial evidence in the record as to [a] calculation to support the award," it was inappropriate for the Court to disregard that evidence and order a new trial. *Landes Constr.*, 833 F.2d at 1373; *see also Tharo Sys. v. Cab Produkttechnik GmbH & Co. KG*, 196 F. App'x 366, 373 (6th Cir. 2006) (discussing decision to remit an award on the basis of an alternative damages theory where the damages theory on which the jury had relied was too speculative); *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1030 (Fed. Cir. 1996) (reversing jury's award of lost profits based on insubstantial evidence, but finding in the record reliable evidence of actual sales and ordering remittitur on that ground). Rather, the Court should have entered judgment on the jury's $75 million verdict based on the alternate willingness to pay evidence in the trial record.

   2. *Wecker's price sensitivity analysis supports a remittitur of at least ▮ million*

Even if the Court disregarded Mills' income approach and Wecker's willingness to pay results, Wecker's price sensitivity analysis supports remittitur to ▮ million. Wecker asked the ▮ of respondents who reported that they would not have purchased their device without the infringing App Permissions feature whether they would have purchased their device if offered a 5% discount—▮ answered "yes." Wecker then asked the remaining respondents whether they would purchase their device if offered 10% discount—▮ answered "yes." This leaves ▮ of respondents would require at least an 11% price discount to purchase a device without

11

the App Permissions feature. Like the willingness to pay results, these price sensitivity results were reported in PX109.0004, which was shown to the jury and admitted into evidence. *See* PX109.0004; 12/5/17 AM Tr. 105:13-24.

These price sensitivity results can be combined with ███████████████ (12/6/2017 (Sealed) Trial Tr. at 23:2-19) to calculate a per-unit royalty. For example, assuming that any respondent who would not buy at a 10% discount would have accepted an 11% discount and that TCL could target these discounts to the appropriate customers (both extremely conservative assumptions in TCL's favor), would result in a per-unit bargaining surplus of ███ ████████████████████████████████████████████████ ██████. As explained in Mr. Mills' accompanying declaration (Ex. 5), this amount can be calculated using simple multiplication ████████████████████ ██████], repeated for the 10% and 11% price points, and summed.). Because the $75 million was fully supported based on TCL's sales of only accused products (Infra II.C) and based on a bargaining surplus presented to the jury of ███ a bargaining surplus of ███ ██████ ██████ based on the price sensitivity analysis would yield a damages award of at least ██ ██████████████████████ *Id*. Like the willingness to pay analysis, the price sensitivity analysis does not implicate the profit margin multiplication concerns that drove the Court to find Mills' income approach methodology unreliable.[10]

Although Ericsson did not advocate for this specific damages award at trial, "a jury is not bound to a damages figure advanced by one of the parties if the record evidence supports a

---

[10] To the extent there is any doubt that the willingness to pay or price sensitivity analysis does not implicate TCL's profit margins, the Court may consider the attached declaration from Robert Mills explaining why that is not the case. *See Medtronic, Inc. v. Boston Sci. Corp.*, 777 F. Supp. 2d 750, 766 (D. Del. 2011) (allowing post-trial supplementation of the record regarding *Daubert* challenge in the context of a challenge to the sufficiency of the evidence), *vacated on other grounds*, 695 F.3d 1266 (Fed. Cir. 2012), *rev'd on other grounds*, 134 S. Ct. 843 (2014).

different figure." *Harris Corp. v. Ericsson, Inc.*, 2003 U.S. Dist. LEXIS 12284, at *30-31 (N.D. Tex. July 17, 2003), *rev'd in part on other grounds*, 417 F.3d 1241 (Fed. Cir. 2005) (citing *Unisplay*, 69 F.3d at 519). Remittitur is appropriate where the jury could have solved the problem "by applying basic mathematics to the evidence." *Id.* at *32. As explained above, basic multiplication is all that is required to extrapolate from the price sensitivity analysis in PX109 to reach a ███ million damages award.

### C. TCL's Complaints Regarding the "Lump-Sum" Royalty Base are Mooted by the Jury Instructions and Waived due to TCL's Failure to Seek a Mistrial

The Order's second ground for ordering a new trial—the inclusion of unaccused products in Mills' revenue projections—addresses arguments that TCL prevailed upon at the charge conference, but does not consider the points raised in Ericsson's post-trial briefing, that: (1) the Court instructed the jury that it should only award damages for accused products, exactly as requested by TCL; (2) Ericsson cut its damages ask nearly in half to cover only accused products; (3) TCL made the strategic decision not to seek a mistrial before submitting the case to the jury; and (4) the jury's $75 million award is supported by substantial evidence based on TCL's own lump-sum projections. Dkt. Nos. 441 at 7-9; 443 at 1-3; 450 at 1-2; 451 at 5-6. If the Court reconsiders its finding that Mills' calculation of "at-risk" profit was unreliable or applies the "maximum recovery rule" based on other admitted evidence, TCL's "unaccused products" argument does not warrant a new trial for all the reasons explained in Ericsson's post-trial briefs. *Id*.

### III. CONCLUSION

By rejecting Mills' income approach methodology as unreliable, the Court broke with a line of cases accepting exactly this type of evidence as sufficient to support a damages award. Contrary to the understanding reflected in the Order, Mills addressed and accounted for each of

13

the concerns raised by the Court. Even if Mills' income approach was unreliable, other evidence in the record supports either the full verdict or at least ███ million. In accordance with the maximum recovery rule, the Court should reinstate the jury verdict or, alternatively, offer Ericsson the option of accepting a remittitur of ███ million.

| | |
|---|---|
| Dated: March 23, 2018 | **MCKOOL SMITH, P.C.**<br><br>*/s/ Theodore Stevenson III*<br>Theodore Stevenson III, Lead Attorney<br>Texas State Bar No. 19196650<br>tstevenson@mckoolsmith.com<br>David Sochia<br>Texas State Bar No. 00797470<br>dsochia@mckoolsmith.com<br>Warren Lipschitz<br>Texas State Bar No. 24078867<br>wlipschitz@mckoolsmith.com<br>Nicholas Mathews<br>Texas State Bar No. 24085457<br>nmathews@mckoolsmith.com<br>Mitchell R. Sibley<br>Texas State Bar No. 24073097<br>msibley@mckoolsmith.com<br>**MCKOOL SMITH, P.C.**<br>300 Crescent Court Suite 1500<br>Dallas, TX 75201<br>Telephone: (214) 978-4000<br>Telecopier: (214) 978-4044<br><br>Samuel F. Baxter<br>Texas State Bar No. 01938000<br>sbaxter@mckoolsmith.com<br>**MCKOOL SMITH, P.C.**<br>P.O. Box O<br>Marshall, Texas 75671<br>Telephone: (903) 927-2111<br>Telecopier: (903) 927-2622<br><br>**ATTORNEYS FOR PLAINTIFFS ERICSSON INC., AND TELEFONAKTIEBOLAGET LM ERICSSON** |

15

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on March 23, 2018.

*/s/ Nicholas M. Mathews*
Nicholas M. Mathews
